WILLIAM SKRAINKA ET AL., Respondents, *v.* GERARD B. ALLEN, STOCKHOLDER, Appellant.

### June 24, 1879.

1. In all matters pertaining to the assets of a corporation, creditors must be preferred to stockholders, and personal profits of members which would diminish the common fund must be held for the benefit of the corporation until the creditors are paid.

2. Where persons become stockholders of a corporation with the understanding that calls are not to exceed a certain per cent, and afterwards calls are made in excess of that amount, to compensate for which second-mortgage bonds are issued to these stockholders, they are liable to the creditors of the corporation for unpaid stock to the amount realized by the sale of the bonds.

3. A corporation cannot increase its liabilities by issuing second-mortgage bonds to its stockholders without valuable consideration.

4. In a proceeding by motion against a stockholder, under the statute, the measure of the defendant's liability is determined by the number of his shares at the date of the motion, after notice given, and not at the date of the return of the execution against the corporation.

APPEAL from St. Louis Circuit Court.

*Reversed and remanded.*

GLOVER & SHEPLEY and JAMES TAUSSIG, for appellant.

R. E. ROMBAUER, for respondents : The liability of the stockholder becomes fixed when the execution against the corporation is returned *nulla bona.* — *Nixon* v. *Green*, 11 Exch. 550 ; *McLaren* v. *Franciscus*, 43 Mo. 452 ; *Miller* v. *Great Republic*, 50 Mo. 55.

LEWIS, P. J., delivered the opinion of the court.

Plaintiffs filed their motion for an execution against the defendant, Gerard B. Allen, as a stockholder in the Illinois and St. Louis Bridge Company, holding unpaid stock, to satisfy a judgment against the corporation for $10,420.21, with interest at eight per cent from November 12, 1875, and costs.

The authorized capital stock of the Bridge Company was $4,000,000, in shares of $100 each. In the early part of the year 1870, $3,000,000 had been subscribed for, on which forty per cent had been paid in cash. This stock commanded a premium in the market. It appears to have been believed at that time by the projectors and friends of the enterprise that no further payments on the stock would ever be demanded ; and this belief soon ripened into assurance, which the managers afterwards, in a manner, felt themselves bound to verify, as will hereafter be seen. The Keystone Bridge Com-

pany had taken the contract for the superstructure.    Andrew Carnigie was a large stockholder in that corporation, and represented it and certain individual capitalists associated with him in transactions with the Illinois and St. Louis Bridge Company.    The latter company being about to issue $4,000,000 of first-mortgage bonds, an agreement was entered into by its executive committee with Carnigie, in the following terms : —

"Memorandum of understanding between the Illinois and St. Louis Bridge Company and Andrew Carnigie and associates : The latter to have three months' time, say until March 20, 1870, *in which to endeavor to negotiate the four million first-mortgage gold bonds of Bridge Co.*    To net the company, if six per cent bonds, eighty-five per cent ; if seven per cent bonds, ninety per cent ; twenty per cent — 800,000 — of the stock of said company to go with the bonds as a bonus.    But should the Bridge Company itself negotiate the bonds by, say January, 1870, then Carnigie and associates to receive only ten per cent of stock, say 400,000.

"NEW YORK, Dec. 10, 1869.

"Stockholders of the Bridge Company to have the right to take their *pro rata* of the bonds on same terms, provided they will agree to hold the bonds for twelve months.    With above amendment, correct.

"WM. TAUSSIG,        } *Ex. Com.*
"WM. McPHERSON,    }

"ANDREW CARNIGIE *and Associates.*"

It appears that under this arrangement it was afterwards agreed that stockholders might take one and a half million of the first-mortgage bonds, and Carnigie would dispose of the remainder.    There was testimony tending to show that a subscription-paper was signed by a large number of stockholders, who thereby agreed to take the bonds on the terms indicated in the arrangement with Carnigie ; but that paper had become lost, and was not produced.    Carnigie disposed

of his two and a half million of bonds in London, at eighty-seven and one-half per cent; and an agent appointed by the stockholders sold their allotment in the same market at ninety per cent. On or about January 21, 1871, the Bridge Company issued stock to the amount of $300,000 to the stockholders who had agreed to take the million and a half of bonds. Of this stock, all of which was credited with forty per cent as paid, seventy-five shares were issued to defendant Allen, who had been one of the earliest supporters of the bridge undertaking, and already held about seven hundred and fifty shares, on which he paid forty per cent in cash. Plaintiff claims that the defendant is responsible to him, as a creditor of the corporation, in the amount of this bonus of forty per cent on seventy-five shares, for which the defendant received a credit but which he never paid.

It is urged for the defendant that this forty per cent was not in fact a bonus, but was fairly earned by the enhanced price for which the bonds sold in consequence of the Carnigie agreement. It does not clearly appear that at the time when the sales were made in London any competent representative of the corporation might not have sold the four millions of bonds on as favorable terms as were obtained by Carnigie and the agent of the stockholders. If this was practicable, the whole expense would have been covered by the ordinary commissions, and there would have been no occasion for an issue of bonus stock. But let it be admitted that the Carnigie arrangement brought a margin of extra profit sufficient to cover or to exceed the amount of the bonus. It does not follow that the defendant, who was a director and a member of the corporation, would be permitted, as against its creditors, to make a profit out of corporate transactions which were directly committed to his control, and thus to absorb a part of the trust-fund, the capital stock, which he held in a distinct trust for the protection of those creditors. As between the stockholder and

the corporation, the transaction was unquestionably valid, and was unaffected by the peculiar considerations which arise when it is impeached in the interest of a creditor. No intimation of bad faith, or of a disregard of what was understood to be the substantial interest of the corporation, is to be entertained at all.   But the rule is inflexible that, in all matters pertaining to the assets, creditors must be preferred to stockholders, and personal profits of members which would diminish the common fund must be held for the benefit of the corporation until the creditors are paid. In *Railroad Company* v. *Howard*, 7 Wall. 392, there was a sale under foreclosure of mortgage of an insolvent railroad company, which was expedited and made advantageous for all concerned by an arrangement between the mortgagees and the stockholders.   By this arrangement the mortgagees got a certain percentage, — some of them realizing the whole amount of their claims, — and the stockholders received sixteen per cent of the par of their stock.   The United States Supreme Court held that the arrangement was void as against creditors not secured by the mortgage ; "and this, although the road was mortgaged far above its value, and on a sale in open market did not bring near enough to pay even the mortgage debts ; so that, in fact, if there had been an ordinary foreclosure, and one independent of all arrangements between the mortgagees and the stockholders, the whole proceeds of sale would have belonged to the mortgagees."   Here was, if anything, a stronger or harsher application of the rule than is demanded in the present case.   We think that the defendant's claim to the bonus of forty per cent on the seventy-five shares must yield to the demand of the plaintiff as a creditor of the corporation.

At a meeting of the stockholders on December 20, 1871, a resolution was adopted as follows :—

"*Resolved*, That to meet the wants of the company in construction, calls be made on the stock from time to time, as the money is required, and that for the first million of

dollars as called, second-mortgage bonds shall be delivered
at their face, to the amount so paid; and any further calls
beyond the million of dollars, if the board of directors
shall be satisfied that the bridge can be completed within
the amount remaining of second-mortgage bonds, then they
shall deliver second-mortgage bonds on the calls as on the
first million, exercising prudent care so as not to exhaust
all the resources of the company without completing the
bridge, and stopping such delivery of bonds whenever
deemed necessary to do so.   The bonds to be delivered
shall have coupons maturing November 1, 1872, cut off and
cancelled before delivery.   Stockholders entitled to a frac-
tion of a bond shall receive a certificate that may be added
to the other fractions so as to make a bond.   A sufficient
number of bonds shall be held to cover outstanding frac-
tions, and on completion of the bridge the bonds held to
be sold, and proceeds distributed *pro rata* on such out-
standing certificates.''

This resolution was shortly afterwards ratified by the
board of directors.   It had become apparent that the un-
paid sixty per cent of the stock issued would be needed, on
account of the increased cost of the bridge over the earlier
estimates.   Good faith towards stockholders who had come
into the company upon an understanding that no calls would
be made beyond forty per cent seemed to require some
compensating arrangement to ease the unexpected burden.
Second-mortgage bonds, simply as a means for raising money
in the market, would be unproductive.   But stockholders re-
ceiving them could afford to wait until the financial success
of the great undertaking should make the bonds ultimately
available.   So it was agreed, as above, that a second bonus,
though not so called, in the shape of second-mortgage
bonds, should be conferred upon the stockholders in recog-
nition of their answers to the additional calls.   Under this
arrangement, the defendant, upon the payment of five suc-
cessive calls upon the stock held by him, at $5 per share,

received in bonds $20,612, which he afterwards sold, realizing the sum of $15,904.59 therefrom.

This transaction stands on a similar footing with the one first described. The liabilities of a corporation constitute a counter-weight against its assets. Whatever consideration should restrain a member from appropriating or diminishing its assets, must have the same influence against his increasing its liabilities. It is true that the stock was here paid for to the extent of the calls, and was not appropriated as a gratuity. But it was a part of the same transaction that the liabilities of the company were correspondingly increased without a valuable consideration. An increase of liability is no less antagonistic to the hopes of the general creditor than is a diminution of assets. The trust relation sustained by the corporator to the creditor embraces as well the duty of avoiding the creation of exhaustive indebtedness, as it does that of husbanding the resources of the corporation by other means. A different rule would deny to members the privilege of enriching themselves at the expense of the corporation by entries on one side of the ledger, and would yet permit them to accomplish the same result by entries on the opposite page. The necessity of looking into the whole transaction in all such cases is illustrated in *Sawyer* v. *Hoag*, 17 Wall. 610. There the stockholder claimed to have paid up his subscription of $5,000 by giving to the company his check for the full amount. The company then professed to loan him $4,250, and gave him a check for that sum, whereupon the stockholder delivered to the company his note for the same amount, with interest at seven per cent per annum, with good collateral security for the payment. The book-entries of the corporation treated the transactions as a payment in full of the stock, and a subsequent independent loan such as was authorized by the charter. It was held that, as between the contracting parties, the treatment was proper, and the transaction binding in that form. But as to creditors of the corpora-

tion, the stock must be considered as unpaid beyond the $750 retained by the company at the outset.

The Circuit Court, in the present case, held the defendant liable as for unpaid stock to the amount which was realized by him from the sale of his second-mortgage bonds. We are of opinion that, in this ruling, there was no error of which the defendant can complain.

Plaintiff's judgment against the Bridge Company was rendered on November 12, 1875. Execution was issued within the same month, and was in due course returned *nulla bona.* The present motion was filed on March 20, 1878. At the date of the return of the execution, defendant held seven hundred and forty-one shares of stock ; but when the motion was filed he had sold and transferred all except twenty-four shares. The question must here be determined, whether the measure of defendant's liability in this statutory proceeding is to be fixed by the number of his shares at the return of the execution, or by the number which he held when the motion was filed. The statute provides : " If any execution shall have been issued against the property or effects of a corporation, and if there cannot be found whereon to levy such execution, then such execution may be issued against any of the stockholders, to an extent equal in amount to the amount of stock by him or her owned, together with any amount unpaid thereon ; *provided always*, that no execution shall issue against any stockholder except upon an order of the court in which the action, suit, or other proceeding shall have been brought or instituted, made upon motion in open court, after sufficient notice in writing to the person sought to be charged ; and upon such motion, such court may order execution to issue accordingly."

The general nature and extent of a stockholder's liability for the debts of the corporation are not here the subject of inquiry. The precise matter to be looked into is his liability to execution under the statute. Against what

stockholder, in point of time, may the execution be issued? At what point in the proceedings does the liability first attach? The answer to the second question will determine the first.

We are referred to *McClaren* v. *Franciscus*, 43 Mo. 452 ; *Miller* v. *Great Republic Insurance Company*, 50 Mo. 55 ; and *Provident Savings Institution* v. *Jackson Place Skating Rink*, 52 Mo. 552, as having settled the law on this subject in Missouri. But those decisions settled nothing upon the question here presented. The stock, in each instance, was transferred before the issuance of execution against the corporation. It was held that, as between the former stockholder and the one who held the stock when the execution was issued and returned, the latter would be liable. The general rule was also affirmed that a solvent stockholder cannot escape responsibility by knowingly transferring his stock to an insolvent person. Those rulings were not intended to determine any question touching the respective liabilities of different holders of the same stock, after the return of *nulla bona*, and before the notice and motion for execution. The statute defines no rule in this connection, and we must reach one, if at all, by interpretation of its general provisions.

There is some analogy between this proceeding and the process in garnishment. The debtor of a defendant in execution is held in a legal responsibility to the plaintiff for the indebtedness of his immediate creditor. The plaintiff may enforce this responsibility by judgment and execution against the garnishee. But the garnishee's liability to such judgment and execution is never fixed until he is actually served with the notice in garnishment. Up to that point, he may at any time escape further responsibility by a settlement with the defendant in execution, or may be released from the plaintiff's claim, at least, by a transfer with notice from the defendant to an assignee. So, while the stockholder is held, generally, in a legal responsibility for the

debt of the corporation, there seems to be nothing repugnant in the idea of his ability to escape the creditor's order in court, and execution, by ceasing to be a stockholder at any time before notice of the motion.

Again, the shareholder's duty of payment upon his unpaid subscription is always understood to await the actual call. Why should a period of default and of liability to execution be ascertained, before he is notified of any demand to be made upon *him?*

It is argued for the plaintiff that since the failure to find "whereon to levy" the execution against the corporation is the expressed condition upon which an execution against the stockholder is allowed, therefore the stockholder's specific liability attaches upon the return of *nulla bona.* But that return is only one of several preliminary conditions. There must have been an execution issued. There must have been a judgment. Each and all of these conditions, the return as well as the others, expend their force, like the general law which precedes them, on the body of the stockholders at large. No one stockholder can know that he is to be selected for the specific liability upon that judgment. In this respect every one stands precisely where he did before the judgment was rendered, sharing with his fellow-corporators a common responsibility for the debts of the company. It is only when the motion is filed upon notice previously given, that the specific liability of the stockholder moved against is ascertained and fixed upon him. The proviso in the statute is emphatic, that no execution shall issue against any stockholder except upon an order made upon motion in open court, after sufficient notice in writing to the persons sought to be charged. Thus, all the previous steps may go for nothing. They at least do no more than prepare an undefined approach against all stockholders, without discrimination. They bring nothing to bear directly upon "the persons sought to be charged."

Neither the judgment against the corporation nor the execution thereon can create any lien against the property of the stockholder who is not a party to either. He is not forbidden to transfer his stock. It is only when he does so after due notice of the creditor's motion that he can be said to act in defiance of the law's demand, and therefore to be attempting a vain thing. A transfer after the notice would, of course, not avail for his escape. But why should it avail at any time before? His liability is purely personal. The notice of its intended enforcement must be given to the stockholder, or " the person sought to be charged as such." Does this naturally apply to one who has been a stockholder, but who is so no longer? Or, does it not rather apply, in strictness and in fairness, to him who is a stockholder at the time of the notice?

In *Nixon* v. *Green*, 11 Exch. 549, a statute was construed, from which the language of ours appears to have been literally taken. The court held that the shareholder liable was he who was such at the time of the. return of *nulla bona*. The specific reason given for the `decision was, that otherwise a solvent stockholder might, after the return of *nulla bona*, transfer his share to an insolvent person, and so defeat . the creditor. Such might well be the result under the English system of corporate liabilities. But in this country the reason is neutralized and the result impossible, in view of the settled doctrine that the capital stock is a trust-fund for the benefit of creditors, and that, consequently, a stockholder who at any time transfers to an insolvent in order to defeat creditors, will be held to his former responsibility, notwithstanding the transfer.

On the other hand, the Missouri statute was construed to an opposite conclusion by the United States Circuit Court in *Baltimore Bridge Company* v. *Illinois and St. Louis Bridge Company et al.*, not reported. Judge Dillon, in a written opinion, held that the person liable to execution under the statute is he who owns the stock at the time

when the motion is filed or the notice thereof given, and not the person who held it at the time of the *nulla bona* return, but who afterwards transferred it to another before the notice. That this rule is fair and equitable he clearly demonstrated, thus : " If there were a transfer of shares, to avoid liability, to an insolvent person, the fraud, of course, would be unavailing. , But if the transfer were made to a solvent party in good faith, and the transfer were made by an insolvent person, could not the solvent party be held? Must the moving party look solely to the insolvent? Ordinarily, a person buys a share of stock just as it is, valuable or valueless ; that is, subject to all the liabilities attaching thereto. He decides for himself, when purchasing, what it is worth, and takes the consequences. If a liability is fastened on the share, the share is burdened accordingly. \* \* \* If the ordinary doctrines prevail, the stockholder in whose hands the stock was found at the date of the call must meet the demand. \* \* \* The date of the motion should therefore be considered as determining the person liable, and the priorities should be accordingly." It may here be added, that the rule declared by the distinguished judge, coupled with the rule which defeats in all cases a transfer to an insolvent person in order to avoid liability, will, in the long run, double the chances of the creditor over those offered by the English rule for holding the solvent stockholder in cases of transfer either way between solvents and insolvents. By the first, in the case of a transfer from an insolvent to a solvent, after the return, the creditor's remedy will prevail against the solvent transferee. By the second, his recourse would still be valueless. In the case of transfer from a solvent to an insolvent, the American rule will generally hold the solvent assignor.

We think that Judge Dillon's interpretation of the statute is sustained by better reasoning than that found in the decision of the Exchequer Court, and therefore adopt it as

developing the true rule for application to the present case. The Circuit Court held the defendant liable to the extent of the stock owned by him at the date of the return of *nulla bona*. He should have been held only for what he owned at the filing of the motion, which, in point of time, should relate back to the service of the notice. Judgment reversed and cause remanded. Judge BAKEWELL concurs; Judge HAYDEN not sitting.