RAMSEY, *Appellant*, v. THE THOMPSON MANUFACTURING COMPANY, *et al.*

Division Two, May 30, 1893.

1. **Corporation**: CAPITAL STOCK: TRUST FUND: CREDITORS. The capital stock of a corporation, including both that paid in and the unpaid subscriptions, is a trust fund pledged for the payment of the debts of the corporation.

2. ——: ——: ——: ——. A corporation can make no arrangement with any of its stockholders by which they are to be released from the payment of any part of their stock subscription so as to affect the rights of creditors.

3. ——: ——: FRAUD: RECOVERY BACK OF MONEY PAID. Where a subscription to corporate stock and the subsequent payment therefor have been procured by fraudulent misrepresentations as to the purposes of the corporation and the amount of paid-up stock, the stockholder may recover back land and money with which he paid for the stock, notwishstanding the insolvency of the corporation; its creditors taking no part in the proceeding.

4. ——: ——: ——: LACHES. A subscriber to corporate stock who made his last payment thereon in June, and began suit in October to cancel the subscription for fraud and to recover back the consideration paid and who did not learn of the insolvency until in November, was not guilty of laches in not earlier discovering the insolvency or instituting suit.

*Appeal from Greene Circuit Court.*—HON. W. I. WALLACE, Judge.

REVERSED AND REMANDED.

*White & McCammon* for appellant.

(1) The allegations of the petition and the evidence show such fraud and misrepresentation on the part of the Thompson Manufacturing Company and its promoters, in obtaining the plaintiff's subscription and

his property in payment for the same, as to entitle him to relief prayed for. The rule that, whatever fraud creates, justice will destroy, applies to subscriptions for stock in a corporation. *Wells v. Jones*, 41 Mo. App. 1; Morawetz on Private Corporations [2 Ed.], secs. 105 and 106; 2 Morawetz on Private Corporations [2 Ed.], sec. 839; Thompson on Liabilities of Stockholders, sec. 142 and 143; *Upton v. Tribilcock*, 91 U. S. Rep. 55; *Manufacturing Co. v. Wheeler*, 6 American and English Corporation Cases 420; *Thompson v. Bank*, 3 Am. St. Rep. 824. (2) Plaintiff's subscription having been made upon, and his property conveyed in pursuance of, a contract, conditional, and the conditions of said contract having never been performed on the part of the corporation, there was such a failure of consideration as to entitle plaintiff to recover. To defeat his recovery the corporation would have to show the performance of all the conditions of the contract. 1 Morawetz on Private Corporations [2 Ed.], sec. 79; *Haskell v. Worthington*, 94 Mo. 460; Waite on Insolvent Corporations, sec. 608; Thompson on Liability of Stockholders, sec. 186 and sec. 190; *Jewett v. Railroad*, 10 Ind. 539; *Chase v. Railroad*, 38 Ill. 215; *Railroad v. Crosswell*, 5 Hill 503. (3) The law requires that a corporation organized as the one in question, shall have all of its capital stock *bona fide* subscribed and one-half thereof paid up in lawful money of the United States. Revised Statutes, 1889, sec. 2768. This is a prerequisite to the existence of a corporation; it is a condition precedent, the performance of which must be shown, before any subscriber for stock is liable on the subscription, and the non-performance of it will entitle such subscriber to recover what he has paid. *Wells v. Jones*, 41 Mo. App. 1; *Ins. Co. v. Ganzhorn*, 2 Mo. App. 205; *Haskell v. Worthington*, 94 Mo. 571; *Railroad v. Schwartz*, 53 Cal. 110; *Hale v. Sanborn*, 20 N. W. Rep.

(Neb.) 97; *Scofield v. Thayer*, 105 U. S. Rep. 143; 2 Beach on Private Corporations, sec. 535; *Doris v. Sweeney*, 60 N. Y. 463; 2 Morawetz on Private Corporations, sec. 845; 1 Morawetz on Private Corporations, sec. 81. (4) A failure to perform such conditions may be set up even if it questions the validity of the corporation itself; and a subscriber may avoid a subscription even to the extent of showing that the corporation was never properly organized. 2 Morawetz on Private Corporations, sec. 778, note; *Haston v. Railroad*, 16 Ind. 279; 2 Beach on Private Corporations, sec. 731; 1 Morawetz on Private Corporations, sec. 74; *Schierenberg v. Stephens*, 32 Mo. App. 327; *Shloss v. Trade Co.*, 87 Ala. 411. (5) The plaintiff did not waive his right to demand the performance of the conditions by the payment of his subscription, or by accepting a certificate of stock. *Jewett v. Railroad*, 10 Ind. 539; *Railroad v. Rowland*, 9 Atl. Rep. (Pa.) 929; Cook on Stockholders, sec. 181; *Hale v. Sanborn*, 20 N. W. Rep. 97; *Haskell v. Worthington*, 94 Mo. 572; *Turnpike Co. v. Lock*, 8 Mass. 268; *Parker v. Thomas*, 19 Ind. 220; *Mills v. Abbott*, 63 Mass. 423; Thompson on Liability of Stockholders, sec. 120; Cook on Stockholders, secs. 88 and 89; *Railroad v. Stewart*, 41 Pa. St. 54. (6) The matters set up in defendant's answer showed no defense to plaintiff's cause of action and the evidence introduced in support of the same was irrelevant. The court could not adjudicate the rights of the third persons. *Boyer v. Hamilton*, 21 Mo. App. 520; *Moon v. Ivers*, 83 Mo. 29; *Reid v. Mullins*, 48 Mo. 344.

*Heffernan & Buckley* for respondents.

(1) Although evidence may have been improperly excluded, yet if it is apparent that such exclusion could in no reasonable view of the case affect the appellant's

rights, the judgment should not be reversed. *Kent v. Meltenberger*, 15 Mo. App. 480; *Brown v. Wright*, 15 Mo. App. 407; *Spiva v. Coal and Mining Company*, 88 Mo. 75; *State v. Lambert*, 21 Mo. App. 307; *State ex rel. v. Leland*, 82 Mo. 265. (2) Although the court may have proceeded erroneously and irregularly, if the judgment is evidently for the right party it will not be reversed. If, in this case, the court, instead of excluding the evidence, had considered it all, the finding and judgment necessarily would have been the same. *Bridge Co. v. Ring*, 58 Mo. 491; *Hedecker v. Ganzhorn*, 50 Mo. 154; *Anderson v. Shockley*, 82 Mo. 255. (3) Unpaid shares or balances are as much a part of the capital stock as a sum that has been already realized, and aside from the funds on hand they often constitute the only resources of the company. They are debts due to it, the payment of which can be enforced by its officers. 13 Wis. 61; 62 U. S. p. 351; Thompson on Stockholders, sec. 10; Thompson on Liabilities of Officers, p. 397; Waite on Insolvent Corporations, secs. 141 and 148 to 150. (4) The contract of subscription merged all prior and contemporaneous negotiations, and parol testimony is not proper to alter and vary it. *Thorp v. Ross*, 4 Keyes, 536; *Riley v. Brooklyn*, 46 N. Y. 444; *Westcott v. Thompson*, 18 Id. 363; *Morton v. Woodruff*, 2 Id. 153; *Vam Keller v. Shulting*, 50 Id. 108; *Mayor v. Ins. Co.*, 3 Abbott's Court of Appeals Decisions, 251; *Railroad v. Eastman*, 34 N. H. 124; *Railroad v. Stewart*, 41 Pa. 54; *Railroad v. Bailey*, 24 Vt. 465; *Railroad v. Patrick*, 2 Keyes, 256. (5) The fraudulent representations of the projectors of the company could not affect the subscription or release the subscriber. *Oglevie v. Ins. Co.*, 22 How. U. S. 380; *Railroad v. Dudley*, 14 N. Y. 336; *Kelsey v. Oil Co.*, 45 Id. 505; *Bank v. Church*, 29 Conn. 137; *Graff v. Railroad*, 31 Pa. 489. (6) It is no defense to

an action on a stock subscription that the defendant was induced to subscribe by the false representation that certain of his neighbors and friends had agreed to take stock in the corporation. *Haskell v. Worthington*, 94 Mo. 560; Waite on Fraudulent Conveyances, sec. 540; *Chetlain v. Ins. Co.*, 86 Ill. 220. (7) The certificate of incorporation bears date of May 19, 1888. Corporate existence dates from the time of filing the copy· of the articles of association with the secretary of state. Revised Statutes 1889, sec. 2492; *Mining Co. v. Richards*, 95 Mo. 110.

BURGESS, J.—This is an action by plaintiff against defendant company, a corporation, to recover back $200, paid by him in money, and to reinvest in him the title to a lot in the city of Springfield, Missouri, which he conveyed to one G. A. Frizzell, trustee, for the use and benefit of the corporation in payment of stock which he had subscribed to it, and which subscription, the payment of the money, and the execution of the deed to the lot in payment thereof, he alleges, were obtained by fraud and fraudulent misrepresentations. The allegations in the petition, leaving out the formal parts, are as follows:

"Plaintiff for amended petition states that the defendant, the Thompson Manufacturing Company, is a corporation duly organized under the laws of the state of Missouri."

That the defendants, Willis H. Thompson, J. H. Pomeroy, G. A. Frizzell, E. G. H. Kirst and J. M. Phillips, on or about —— day of ————, 1888, entered into and formed a conspiracy for the purpose of organizing a bubble company, whose ostensible and nominal purpose was to establish, in the city of Springfield, Missouri, a manufacturing plant and manufacture children's carriages, children's wagons, wooden

and willow ware, hobbies, swings, jumpers, hammocks and so forth; but for the real purpose of cheating and defrauding the plaintiff and other citizens of the said city of Springfield. That in pursuance of their fraudulent scheme and design, as aforesaid, the defendants made and presented to the plaintiff a contract and agreement of subscription to the said company, which contract and agreement is in words and figures as follows, to-wit:

"'We, the undersigned representatives of the Thompson Manufacturing Company, propose to establish in the city of Springfield, Missouri, a manufacturing plant for the purpose of manufacturing children's carriages, children's wagons, wooden and willow ware, hobbies, swings, jumpers, hammocks, etc., etc. And we further propose to locate the said manufacturing plant in the city of Springfield, Missouri, on the following terms and conditions, to-wit:

" 'We propose to file articles of incorporation of the Thompson Manufacturing Company, with a capital stock of $100,000, divided into two thousand shares of the uniform par value of fifty dollars ($50) each, with a paid capital stock of fifty per cent. of the entire capital stock in accordance with the laws of the state of Missouri, and we further propose to the citizens and business men of the city of Springfield, that in consideration of their subscription for stock in the said plant to the amount of twenty thousand dollars ($20,000), or four hundred shares of fifty dollars ($50) each, payable as follows, to-wit: Ten per cent. of said subscription payable on or before thirty days after date of obligation, and ten per cent payable four months after date of obligation, and ten per cent. payable seven months after date of obligation, ten per cent. payable ten months after date of obligation, and ten per cent. payable thirteen months after date of obligation,

and the balance of said subscription to be paid in upon call by the board of directors of the said Thompson Manufacturing Company, in assessments *pro rata* with the payments hereinbefore provided for, not to exceed at any one time ten per cent. of the total amount of said subscriptions.

" 'In consideration of the above, we, as representatives of the Thompson Manufacturing Company, agree to purchase the building known as the old cotton mill building, situate in the city of Springfield, Missouri, and to equip it and put the said works into operation within ninety days after date of the purchasing the said building; and we further agree to locate in and direct all our interests toward the city of Springfield, Missouri.

" 'Witness our hands, this twenty-second day of March, A. D. 1888.'

"That the said contract of subscription was duly signed and executed by said Willis H. Thompson, president of said corporation, J. H. Pomeroy, and E. G. H. Kirst, who constitute the majority of the board of directors of said corporation.

"That the said defendants, in further pursuance of their fraudulent scheme and design to defraud the plaintiff, represented to the plaintiff that they were men of large means, and that they had in their possession and under their control a large sum of money, to-wit:   Fifty thousand dollars ($50,000).

"That the capital stock of said corporation of the amount of fifty thousand dollars ($50,000) had been fully paid up by them, and that the said sum of fifty thousand dollars ($50,000) was then in the hands of the board of directors of said company.

"All of which statements were false and fraudulent, and known to be so by the defendants at the time they were so made, and were for the purpose of inducing

the plaintiff to subscribe for stock in said corporation.

"That the plaintiff, relying upon said statements and representations, and upon the promises of the said defendants and the said company, to carry out and fulfill the terms and conditions set forth in said contract of subscription, was induced to subscribe by the terms in said contract, in said company, for ten shares of the stock of the par value of fifty dollars ($50) each.

"That defendants afterwards, to-wit: on or about the ——— day of June, 1888, in further pursuance of their fraudulent design to defraud the plaintiff, represented again to the plaintiff that their said company had been organized, and that the full amount of capital stock, to-wit: fifty thousand dollars ($50,000) in said company had been paid up by said defendants, and that the said defendants and the said corporation had already purchased machinery for the purpose of equipping the building mentioned in said contract of subscription as the 'Old Cotton Mill' building and that the said company would be soon in operation, in accordance with the terms in said contract of subscription.

"The plaintiff, believing said statements to be true, and relying in good faith upon the purpose of said company and its said promoters and originators to carry out the terms of said contract of subscription, paid to the said corporation and its said officers the amount of his subscription, as follows, to-wit: two hundred (200) dollars in cash, and conveyed to said Frizzell in trust for said corporation under the direction of the officers and board of directors of said company, in payment of the balance due on his said subscription, a lot of land of the value of three hundred (300) dollars, which lot of land is situated in Greene county in the state of Missouri, and described as follows, to-wit: Lot twenty-one (21) in Orchard's addition to the city of Springfield, Missouri.

"That the said statements and each and all of them made by the said defendants to the said plaintiff, concerning the capital of said company, and concerning the wealth and means of its said promoters and originators were false and fraudulent, and made with the intention to deceive the plaintiff, and for the purpose of inducing him to subscribe for and purchase a portion of the stock of said company.

"That at the time the said defendants made the false and fraudulent statements, as aforesaid, they had no property whatever, and no part of the said capital stock of fifty thousand (50,000) dollars had been or was thereafter paid up by the said defendants or any one of them.

"That the said corporation has not complied with the terms and conditions in said contract mentioned and specified, nor any one of them nor any part thereof, but have wholly failed to engage in the business of manufacturing as in said contract provided, or to pay the sum mentioned in said contract into said company's capital stock, or any sum whatever, or to equip with machinery and put in operation the building mentioned in said contract as the 'Old Cotton Mill' building or to perform any one of the stipulations, conditions and agreements mentioned in said contract; but that the said corporation and its managers did engage in other and different business from that mentioned in said contract of subscription.

"That the plaintiff has tendered to the defendant company, and to its proper officers, his said stock and requested them to return to him his money paid, and and reconvey to him the lot aforesaid, but the defendant corporation refused to accept the said stock, or to return to the plaintiff his said property.

"Wherefore the plaintiff prays judgment that his contract of subscription to and purchase of said stock be

rescinded and canceled; and that the court order and decree a return to plaintiff of the two hundred dollars ($200) aforesaid, and the court divest the defendant Frizzell of the title to said lot of land and vest the same in plaintiff, and plaintiff offers and tenders into court for the defendants his certificates of stock aforesaid.''

The answer is as follows:

''Defendants for answer to plaintiff's petition admit that the said plaintiff is a stock holder in the Thompson Manufacturing Company, but deny each and every other allegation in said petition mentioned. Deny all fraud as charged by the plaintiff.

''And for another separate and distinct defense to the said plaintiff's supposed cause of action, say that at the time of the organization of the said corporation mentioned in said plaintiff's petition the said plaintiff was one of the organizers and one of the promoters of the said enterprise, also being one of the original subscribers; that the said corporation was organized by a large number of citizens of Springfield, subscribing to the said capital stock amounting in the aggregate, to twenty-eight thousand, seven hundred dollars, out of which amount there were only six hundred dollars paid. The said corporation became insolvent, owing large debts aggregating about twenty thousand dollars. The insolvency of the said company was caused by the said subscribers not paying for their subscribed stock. That after exhausting the assets of said corporation there still exists and remains unpaid large amounts of debts due from said corporation to various creditors aggregating about fourteen thousand dollars. That judgment has been rendered on the same, executions issued against the said corporation and the same was returned *nulla bona*. The said judgments are in full force in this court in favor of said various creditors and against the said corporation.

"And the defendants further state that if the said corporation is the legal or equitable owner of the lot described in the said plaintiff's petition, in such case the said judgment would be a lien on the same, and if this honorable court should find from the evidence in this case that the said property in plaintiff's petition, same being lot twenty-one in Orchard's addition to the city of Springfield, Missouri, is in the name of G. A. Frizzell in trust for the use of the Thompson Manufacturing Company, then in such case the defendants pray that a decree be entered divesting the said G. A. Frizzell of all right, title and interest in the same and investing the same in the Thompson Manufacturing Company, for the purpose of satisfying the said judgments rendered against the said Thompson Manufacturing Company as above stated."

To this answer plaintiff replied denying all new matter contained therein.

The court found for defendants, and after an unsuccessful motion for a new trial, plaintiff prosecutes his appeal to this court.

That the capital stock of a corporation, both that which has been actually paid, and subscriptions thereto which remain unpaid, are ordinarily regarded in law as a trust fund, pledged for the payment of the debts of the corporation, there can be no question. *Foster v. Planing Mill Co.*, 92 Mo. 79; *Adler v. Brick Mfg. Co.*, 13 Wis. 57. Nor can a corporation make an arrangement with any of its stockholders, by which they are to be released from the payment of their stock subscribed, or any part thereof, so as to effect the rights of its creditors. This has been so held by this court. *Insurance Co. v. Floyd*, 74 Mo. 286; *Gill v. Balis*, 72 Mo. 424; *Upton v. Tribilcock*, 91 U. S. 45.

But does it necessarily follow that where a subscription to the stock of a corporation is obtained by

fraud and fraudulent misrepresentations, and the corporation is at the time, or afterwards becomes, insolvent, that there is no relief for the subscriber and that he is, under such circumstances, deprived of any and all defense, and that he is bound to pay, as a matter of course?

At the trial plaintiff was sworn as a witness in his own behalf and testified as follows:

"Sometime in the summer of 1888, I subscribed for stock in the Thompson Manufacturing company and signed an agreement of this kind. This is the same agreement that I signed. There were a number of copies circulated and the one I signed was an exact copy of this. I signed it along in April, perhaps March. At the time of signing that contract I had been introduced by Mr. F. E. Atwood to Mr. Thompson, Mr. Kirst and Mr. Pomeroy, the three gentlemen stopping at the Ozark hotel. We talked over the object of their visit; they told me what they were proposing to come here for, and what they proposed to do. They were all three together when I was talking to them. This agreement was produced afterwards. Mr. Atwood, I think, came in with one of them, I don't recollect which one of them was along, and presented the agreement.

"Q. So far as you could gather from the talk you had with these parties, who was promoting or originating this corporation? A. Well, it was these three gentlemen I have just mentioned, Mr. Thompson, Mr. Pomeroy and Mr. Kirst. I didn't know at that time any other parties in it. I knew nothing about the organization and had nothing to do with it whatsoever. I signed that agreement, and upon the representations contained therein, I signed it. I didn't know anything further about the organization until Mr. Frizzell came around. I don't think I had ever met him; I had seen him on the street, and had been told that he was to be

secretary of the company. That was several weeks after I had subscribed to this; it might have been six weeks. It was immediately previous to making this deed; perhaps a day or two; it might have been the same day I made the deed. He came in and he had the stock of the company and also promissory notes to sign, and I looked at the notes and inquired about the organization, if they had completed the organization and he said they had; and I objected to signing the notes because they were regular promissory notes. He represented himself to be the secretary of the company at that time. I objected to signing the notes because they drew interest, and he claimed that there was interest contained in the agreement, and I asked him to show me the agreement and he said the agreement had been lost; and I told him I hadn't agreed to pay interest and I would just pay him the cash.

"Q. What did he say, if anything, regarding the amount of capital stock in the company? A. Well, he said there was $50,000 paid up. The stock that he presented showed that. I don't remember just what conversation was had, but I remember the question was called up as to the amount of capital stock. The original subscription had been $100,000, half paid, and the subscription he presented represented $50,000 fully paid, and he represented that the company was fully organized, and of course with the understanding that the money was in the treasury, $50,000, or I wouldn't have paid that. That called for $100,000 half paid, and the stock shows that it was $50,000 full paid; but I didn't consider that as material. Understanding that the thing was all right and regular and in accordance otherwise with the agreement, I made the deed and gave it to Mr. Frizzell as he directed me to, and paid the $200 in cash and received that stock.

"*Q*. .What induced you to pay the money and convey that lot to this company or Mr. Frizzell? *A*. Well, the primary object was the starting of a manufactory here in the city of Springfield. In fact, that was the only reason that I would have taken any stock in it. I expected to help start a manufactory here and it was their representation that they had purchased the cotton factory and were going to start into the manufacture of children's carriages, etc., and that they had this amount of capital put in themselves. That is what induced me to subscribe in the first place. At the time the stock was delivered to me, I understood that the cotton mill was purchased. It was mentioned at that time. I understood that the purchase had been made from them previous to this time.

"*Q*. You had understood it from these parties that the purchase was made? *A*. Yes, we had talked it over a great deal previously.

"*Q*. What did the company finally do in regard to this cotton mill building and establishing their manufacturing plant here? *A*. Well, the thing run along for several weeks, and the first thing I knew some of the gentlemen opened—commenced storing goods in the Mercantile building on Commercial street there, a kind of a stock of goods, baby carriages and wooden ware of different kinds, and at that time I didn't know that it had any connection whatsoever with the Thompson Manufacturing Company. I believed they were going to run the store outside of any connection with it, and not as a part of the business of the corporation, and I didn't pay much attention to it for several weeks, and it began to be talked about the streets that it was the Thompson Manufacturing Company doing it, and in a short time there was a meeting called by some of the original stockholders, I think, perhaps, Mr. Pomeroy called it, of the stockholders in the Mercan-

tile Company's building and I went to the meeting, and there were perhaps ten or twelve or fifteen of the parties who had subscribed stock like myself, but there was nobody there—there didn't anybody explain anything. Mr. Pomeroy thought there wasn't enough of the stockholders out to explain it, and I never knew the object of the meeting, it wasn't stated; and they adjourned the meeting and called it for a few nights after that, and it was impossible for me to be there, and I don't know what they did, if they had a meeting at all. But by this time I had found out that they hadn't started the manufactory, they hadn't done the thing for which I had subscribed, and I had become satisfied that the originators of it were trying to perpetrate a fraud upon the subscribers, and I went into the office and handed Mr. Frizzell, or tendered him my stock and told him that I was satisfied that the institution was a fraud, and I told him I wanted my money back and my deed back. He told me he couldn't do anything for me; couldn't pay it back. Mr. Frizzell, besides being secretary of the company, was treasurer, as I understood it, secretary and treasurer, and this tender of my stock was about ten days before this suit was brought. When they refused my offer I consulted my attorneys, and the suit was brought a few days afterwards. At that time they had done nothing whatsoever that I know of to carry out the purpose of establishing a manufacturing plant; they have never done anything since in the city of Springfield to carry out that design. One of the original projectors is in the court room here, and I don't know where the others are. They never manufactured anything at the store, but just kept a general store."

*Cross-Examination.*—"I don't know without referring to the papers when I brought my suit; It was in October, perhaps; it was earlier than November. I

can't tell exactly the date that they opened up business in the Mercantile building; I presume it was in July; I have no way of refreshing my memory; I think it was in July. I couldn't give the date of the first meeting of the stockholders, at which Mr. Pomeroy stated there wasn't enough stockholders to have a business meeting; I think it was some time in August, 1888. The store in the Mercantile building filled the entire building; there was two stories pretty well packed with goods; I don't know what was in the third story; I never was in the basement. The kind of goods in the store were pictures, dishes, household utensils of all kinds, a sort of furnishing store. All kinds of toys of every description. I understood in a general way that it was the Thompson Manufacturing Company that was running that business. I understood that all during the latter part of the month of August, September and October, up to the time I brought suits. I discovered they were insolvent about the thirteenth of November.

"Q. I will ask you if you didn't know at the time you brought suit that the creditors had taken charge of the store. I will ask you if you didn't know that the creditors were in charge of the assets at the time you brought suit and at the time you made a tender of your stock? A. No, sir; I didn't.

"Q. Well, did you hear that? A. I don't think that I heard anything of the kind. The first notice I had of the creditors having charge of their goods was November 13th. That was under a mortgage.

"Q. I will ask you if you wasn't informed, or if you didn't hear rumored at the time you presented your stock and asked the return of your money and cancellation of that deed or return the conveyance of real estate, they were insolvent and if that wasn't the reason you wanted to get your money back? A. Well, I heard it rumored that they were not what they repre-

sented themselves to be about being solvent; I didn't know to just what extent, whether they were able to pay their debts or how much money they had. I didn't know at that time they had as a mercantile institution failed to pay for the goods they had bought, and that their creditors were pushing them. My office is within one block of the building, and I pass there three times a day, and still pass there. I passed there until the thing was closed out.''

The articles of association of the corporation recited that: ''The capital stock is $50,000, to be fully paid, divided into one thousand shares of the par value of $50 each. The entire stock has been actually and *bona fide* subscribed, and fifty per cent. thereof paid up in lawful money of the United States, and in the custody of the persons named as the first board of directors.'' Then followed a list of shareholders, seven in number, with the number of shares purporting to have been subscribed by each, aggregating one thousand shares. The articles were signed and sealed by the same persons, who affixed the same number of shares, aggregating one thousand, opposite their respective names. These articles were filed in the office of the secretary of state on the nineteenth day of May, 1888.

The ''Old Cotton Mill'' was never bought. Nor did the corporation ever manufacture any wares of any kind. Nor was there any part of the capital stock ever paid, except about $600. The corporation was insolvent from its inception—without money or assets of any kind. W. H. Thompson, G. A. Frizzell and E. G. H. Kirst were all witnesses in the case, and neither of them denied the statements which plaintiff stated were made by them respectively to him. That the subscription, and deed for the lot in payment thereof were obtained by fraud and fraudulent misrepresentations, there is no question. This being true, can plaintiff recover the

money paid by him and compel a reconveyance of the lot conveyed by him to Frizzell in payment of such subscription, on the surrender of his certificate of stock which he proposed to do?

This is not a contest between the creditors of an insolvent corporation and one of its stockholders. No creditor of the corporation is a party to this suit. It has been said that, as a general rule, any false statement or representations which induces a person to become a shareholder in a corporation, if made by an agent within the general scope of his powers, will enable the shareholder to repudiate his contract. Morawetz on Private Corporations [2 Ed.], secs. 105, 106 and 839; Note to *Thompsom v. Savings Bank*, 3 American State Reports, 824; Cook on Stock and Stockholders, secs. 142 and 143. In the case at bar the fraudulent statements and representations were made by Frizzell, the financial agent of defendant corporation, and in the articles of association in which it is stated that the capital stock of $50,000—which has been all taken—and fifty per cent. thereof paid and in the custody of the persons named as the first board of directors.

In England the rule seems to be that the insolvency of the corporation is a bar to the subscriber's remedies; and that he cannot in such case avoid the payment of stock subscribed by him upon the ground that the subscription was obtained by fraud. Cook on Stock and Stockholders, sec. 163, page 174. The same writer says: "In this country the effect of corporate insolvency upon the right of a subscriber to rescind his contract for fraud has not been so clearly determined. The decided tendency of the decisions, however, is that corporate insolvency is a bar to such rescission. In the bankruptcy courts, under the late bankruptcy law, such a rule was upheld." Sec. 164. See also *Ruggles v. Brock*, 6 Hun 164; *Saffold v. Barnes*,

39 Miss. 399; *Duffield v. Iron Works*, 31 N. W. Rep. 310; *Chubb v. Upton*, 95 U. S, 665; *Upton v. Tribilcock*, 91 U. S. 45, *supra;* 2 Morawetz on Private Corporations, sec. 840, and cases cited.

The authorities last cited were mostly cases in which the action was being prosecuted by the assignee of an insolvent corporation, or a receiver of such a corporation under the bankrupt laws, and against some subscriber to stock in the corporation for the balance remaining due and unpaid on his subscription. And while Mr. Cook says that the decided tendency of the decisions in this country is that corporate insolvency is a bar to such rescission, and the fact that the subscription was obtained by fraud and fraudulent representations is not available as a defense in a suit against the subscriber to compel the payment of his stock, this court seems to have held otherwise in the case of *Haskell v. Worthington*, 94 Mo. 560. BRACE, J., in delivering the opinion of the court in that case, which was an action by the assignee of a corporation upon a subscription to its capital stock to recover the par value of the shares for which the defenndant had subscribed, held that as the assignee stood in the shoes of the corporation, it was a good defense to show that the corporation had entered into active business with less capital stock subscribed than the amount stated in its articles of incorporation, the defendant not having by his conduct estopped himself from setting up the defense. That the assignee occupied no better position than the corporation did.

The statute, under which defendant corporation purports to have been authorized, provides that the articles of agreement shall contain "the amount of the capital stock of the corporation, the number of shares into which it is divided, and the par value thereof, that the same has been *bona fide* subscribed, and one-half

thereof actually paid up in lawful money of the United States, and is in the custody of the persons named as the first board of directors or managers.'' Revised Statutes 1879, sec. 926. This recital in the articles of incorporation was not only false, but all the allegations in the petition as to fraudulent statements and misrepresentations are proven by undisputed evidence.

Plaintiff testified that he executed the deed to the lot to Frizzell on the twenty-seventh day of June, 1888, at which time he also paid the last cash payment on his subscription of stock. That he brought his suit in October, perhaps, and he discovered the insolvency of the defendant corporation on the thirteenth day of November next thereafter. So it cannot be held that he was guilty of laches in not earlier discovering its insolvency or in instituting his suit.

The corporation, in its answer, admits its insolvency, and claims that the money and lot that it obtained from plaintiff by fraud and fraudulent representations ought to be applied to the payment of its debts. The creditors, so far as this record shows, are not taking any part in this proceeding; and as between the plaintiff and defendants, the plaintiff is entitled under the evidence to judgment for the amount of money paid by him on his subscription to the capital stock of the incorporation, and for a reconveyance to himself of the lot, conveyed by him to Frizzell. The judgment will be reversed and cause remanded with directions to the trial court to enter up judgment in conformity with the views herein expressed. All concur.