CHRISMAN-SAWYER BANKING COMPANY to use of SIMPSON, Appellant, v. INDEPENDENCE WOOL MANUFACTURING COMPANY and McCOY.

### Division One, May 21, 1902.

1. **Corporation**: UNPAID STOCK: APPELLATE PRACTICE. Where $50,000 of corporation stock was issued and only $40,000 was paid for, and then $10,000 thereof was purchased by the company and made "treasury stock," the Supreme Court, in a suit to charge the stockholders for unpaid subscriptions, will, on appeal, treat the forty thousand dollars of stock as fully paid up and the ten thousand as wholly unpaid, if the parties and the trial court so treated the matter.

2. ———: ———: LIABILITY OF SUBSCRIBER: SUBSEQUENT CREDITOR. A subscriber to stock in an incorporated manufacturing company, that has not been fully paid up, can not, by any devise or arrangement with the company, its officers or all its stockholders, surrender his stock to the company and be released from liability for the amount remaining unpaid on such stock, to either existing or subsequent creditors of the company. This is now well settled in Missouri.

3. ———: ———: ———: LIMITATIONS. The statute (sec. 1330, R. S. 1899) limiting the liability of a stockholder for the payment of any debt contracted by any corporation to such debts as are to be paid within one year, and releasing any stockholder who shall cease to be such unless suit is brought within two years thereafter, does not apply to a suit to charge stockholders for unpaid subscription for stock. That section refers to debts of the company, but unpaid stock subscriptions are debts of the stockholder to the company, and are in no sense debts of the company.

4. ———: ———: ———: PARTY PLAINTIFF: TRUSTEE OF EXPRESS TRUST. After a corporation had issued unpaid-up stock, the stockholders sold their shares to plaintiff's partner, who with others guaranteed a bank in the payment of the company's debts, and after the company's properties were exhausted and a judgment had been obtained by the bank against the company for the balance of the debt, the plaintiff bought the judgment by means of a note signed by himself and his partner. The note has never been paid. Plaintiff knew that the company had nothing, knew nothing about the liability of the stockholders for unpaid subscriptions, and his testimony clearly shows he was simply trying to help his partner and expected his partner to protect him, and the bank made no contract with him for the benefit of his partner. *Held*, that he is not "the trustee of an express trust," and that his partner being the real party in interest, he is not entitled under the statutes (sec. 540 and 541, R. S. 1899) to maintain an action to charge the stockholders for their unpaid subscriptions for stock.

Appeal from Jackson Circuit Court.—*Hon. John W. Henry,* Judge.

AFFIRMED.

*Flournoy & Flournoy* and *C. O. Tichenor* for appellant.

(1) The so-called "sale" or "surrender" of stock by defendant John McCoy to the company was *ultra vires* and void, and he remains liable to plaintiff as a creditor of the company; regardless of the fact that the transaction between McCoy and the company took place prior to the time when the claim on which plaintiff sues accrued. 1 Morawetz on Private Corp., sec. 109; vol. 2, sec. 824; 2 Thompson's Com. on Law of Corporations, sec. 1151; Ins. Co. v. Floyd, 74 Mo. 286; Nichols v. Stevens, 123 Mo. 96; Ollesheimer v. Mfg. Co., 44 Mo. App. 172; Wells & Co. v. Mfg. Co., 54 Mo. App. 45; Shickle v. Watts, 94 Mo. 410; Rawhide Co. v. Hill, 72 Mo. App. 142; Skrainka v. Allen, 7 Mo. App. 434; s. c., 76 Mo. 384; Gill v. Balis, 72 Mo. 424; Ramsey v. Mfg. Co., 116 Mo. 323; State ex rel. v. McGrath, 86 Mo. 239; Bank v. Thompson, 19 Nev.

103; Hamor v. Eng. Co., 84 Fed. 397; Putnam v. Hutchinson, 45 Pac. Rep. 931; s. c., 4 Kan. App. 273; Allibone v. Hager, 46 Pa. St. 48; Railroad v. Bowser, 48 Pa. St. 29; Alling v. Wenzel, 133 Ill. 264; Singer v. Given, 61 Iowa 393; Railroad v. Eastman, 34 N. H. 140; Upton v. Tribilock, 91 U. S. 45; Crandall v. Lincoln, 52 Conn. 94. (2) Where a method is provided by statute, as in this State, whereby a corporation may reduce its capital stock, that method is an exclusive one, and the requirements of the statute must be strictly complied with. Sec. 1328, R. S. 1899; Mfg. Co. v. Hilbert, 24 Mo. App. 343; 1 Morawetz on Private Corp., sec. 114.

*Samuel H. Woodson* and *Wallace, Wallace & Culbertson* for respondents.

(1) A contract of subscription for shares of stock in a corporation may be rescinded and cancelled by the mutual consent of the subscriber and the corporation and all other stockholders, and the withdrawing member will not be liable for the debts of the company thereafter contracted. Johnson v. Lullman, 15 Mo. App. 55; Johnson v. Lullman, 88 Mo. 567; Erskine v. Peck, 13 Mo. App. 280; Erskine v. Peck, 83 Mo. 465; Hill v. Coal Mining Co., 124 Mo. 167; 1 Beach on Private Corp., secs. 101 and 113; Cook on Law of Stock and Stockholders, sec. 168; Stewart v. Railroad, 32 Grattan 146; Evans v. Smallcomb, L. R. 3 H. L. 249; Morgan v. Lewis, 46 Ohio St. 1; Ins. Co. v. Swigert, 135 Ill 162; Chetlain v. Ins. Co., 86 Ill. 224; Fruit Co. v. Coon, 107 Cal. 447; Dunne v. Howe, 96 Fed. 163; Graham v. Railroad, 102 U. S. 148; Steacy v. Railroad, 5 Dillon 348; Beach on Private Corporations, sec. 101. (2) The contention of the appellant that the act of the corporation releasing the defendant's subscription was *ultra vires* and void, is based on the theory now exploded, that the assets of a corporation are held by it in trust for its creditors. This theory does not obtain in this State, and has

been so modified in the jurisdiction in which it originated (the United States courts) as to amount to nothing more than a rule that after the company becomes insolvent its assets must be first applied in payment of its debts before anything can be distributed among stockholders. Butler v. Land & Mining Co., 139 Mo. 468; Schufeldt v. Smith, 131 Mo. 280; Alburger v. Bank, 123 Mo. 313; Bank v. Ward, 111 Fed. 787; Hollins v. Coal Co., 150 U. S. 371; Graham v. Railroad, 102 U. S. 148; Hospes v. Mfg. Co., 48 Minn. 144. In each and every one of the Missouri cases above cited the trust fund theory is repudiated and the rule established that a corporation holds its property by the same title and with the same power of control and disposition as a natural person. (3) It is thus seen from the foregoing cases that it is the doctrine generally, as well as in Missouri, that unpaid subscriptions to the capital stock of a corporation may be surrendered to the corporation, and the shareholder will not be liable thereon for future debts of the company. The cases holding this doctrine in Missouri, viz., Johnson v. Lullman, 88 Mo. 567; Erskine v. Peck, 83 Mo. 465, and Hill v. Coal Mining Company, 124 Mo. 167, could not of course be overruled by the St. Louis Court of Appeals, as claimed by appellants. And it should be borne in mind that this rule obtained in this State as a rule of property when the transaction in question occurred. (4) This proceeding is barred by section 1330, Revised Statutes 1899, relating to private corporations. The debt sued on herein, according to the promissory note filed with the petition, and which was offered in evidence in the case, matured August 5, 1896. The suit against the corporation, according to the petition which was put in evidence, was filed on December 28, 1898, which was not within one year after the debt became due. Not only was this suit not filed within two years after the defendant had ceased to be a stockholder and had surrendered his stock, but was brought more than ten years after that date. The statute of limitations is treated as appli-

cable to a motion of this kind in the case of Nichols v. Stevens, 123 Mo. 115.

MARSHALL, J.—*Motion to charge stockholder for unpaid subscription for stock.*

In 1888 McCoy and McAfee, as partners, were engaged in the operation of a woolen mill at Independence. On the 28th of August of that year they organized a business corporation under the name of "The McCoy and McAfee's Wool Manufacturing Company," with a capital stock of fifty thousand dollars, the whole of which was alleged to have been bona fide subscribed, and the full amount thereof actually paid up in lawful money of the United States and to be in the custody of the persons named as the first board of directors. The stockholders and the number of shares owned by each were stated in the articles of incorporation to be as follows: John McCoy, 240 shares; John F. McAfee, 125 shares; James T. McAfee, 125 shares; Joseph McCoy, 10 shares. The purpose of the company was principally the manufacture of wool.

It was not true as stated, that the capital stock was fully paid up in cash. On the contrary no cash was paid. The property then belonging to the partnership of McCoy and McAfee was turned over to the company at its cost price of forty thousand dollars. The four persons above named composed the board of directors and constituted the entire body of the stockholders.

It was nowhere stated that the $40,000 was to be applied to the payment of any particular shares. If applied to all the $50,000 stock ratably it would be sufficient to pay up eighty per cent of all the stock, and leave each share with twenty per cent unpaid. To relieve the situation thus presented, they resolved that the company should purchase fifty shares of the capital stock from John McCoy, and twenty-five shares from each of the McAfee's at the par value of one hundred dollars

a share, and that the shares so purchased should be "treasury stock," and be owned by the company.    The shares so to be purchased were not designated.    It was not even then stated that this would leave forty thousand dollars of the stock fully paid and ten thousand wholly unpaid, but the parties so treated it, and the lower court so treated it, and therefore the case will be determined on that theory by this court.

Afterwards the McCoys and the McAfees sold all of their stock in the company to Gudgell and his associates.    Gudgell was elected president and the name of the corporation was changed to the Independence Wool Manufacturing Company. This took place prior to 1893.    At that time the company owed the Chrisman-Sawyer Banking Company about seven thousand dollars, which was evidenced by notes of the company. The bank had but little confidence in the company and so it had required McCoy and McAfee to guarantee the indebtedness.    When Gudgell and his associates bought out McCoy and McAfee, they gave their guarantee to the bank in place of that formerly given by McCoy and McAfee.    The liability of the company to the bank afterwards increased until it amounted in 1896, to about forty-four thousand dollars. In 1896 the mill burned, and after all the assets of the company were turned over to the bank, and after they were all exhausted, there remained about $7,500 due the bank.    The bank reduced this claim to a judgment, an execution against the company was returned nulla bona, and the bank was about to proceed against Gudgell and his associates on their guarantee, when Gudgell procured his friend and partner in the cattle business, T. A. Simpson, to buy the judgment against the company.    This was done by giving the bank a note for the amount of the judgment made by Gudgell and Simpson. In addition to being partners they had lived together in the same house for over seventeen years.    Simpson says he knew the mill had burned; that he had bought the land on which it stood when it was sold under a deed of trust; that he knew

of no assets the company had; that he did not know anything about the "treasury stock" transaction, but that he purchased the judgment to protect Gudgell. The judgment was based upon a note dated May 5, 1896, and this note was a renewal note, based upon an indebtedness that had been contracted after 1893 when McCoy and McAfee sold out to Gudgell and his associates. The suit was begun on September 28, 1898.

After the judgment was transferred by the bank to Simpson, he filed a motion in the original case against John McCoy, seeking to recover from him the sum of five thousand dollars as the unpaid subscription on the fifty shares of stock so turned back to the company as "treasury stock" as aforesaid. Various defenses were interposed by the defendant, which will be adverted to hereinafter. The trial court entered judgment for the defendant, and the plaintiff appealed.

## I.

The first question that is presented is, whether a subscriber to stock in an incorporated company, that has not been fully paid up, can, by any device or arrangement with the company, its officers or all of the other stockholders, surrender his stock to the company and be released from all liability for the amount remaining unpaid on such stock, and thereby be relieved of all responsibility on account of such stock to existing or subsequent creditors of the company.

It is conceded by all text-writers and adjudications and by the plaintiffs herein, that such a subscriber can not be so released as to existing creditors, without their consent. But it is claimed by the defendants that subsequent creditors can not complain or object, because when they gave credit to the company such unpaid subscription did not constitute an asset of the company, and in support of this contention the defendants cite Erskine v. Peck, 13 Mo. App. 280, affirmed by this court in 83 Mo. 465; Johnson v. Lullman, 15 Mo. App.

55, affirmed by this court in 88 Mo. 567; Hill v. Mining Co., 124 Mo. 167; 1 Beach on Private Corp., secs. 101 and 113; Cook on Stocks and Stockholders, sec. 168; and cases in other jurisdictions, including Morgan v. Lewis, 46 Ohio St. 1; Ins. Co. v. Swigert, 135 Ills. 162; Dunn v. Howe, 96 Fed. Rep. 163; Graham v. Railroad, 102 U. S. 148; Trust Co. v. Abbott, 162 Mass. 148; Steacy v. Railroad, 5 Dillon 348.

Beach on Private Corporations, vol. 1, sec. 113, states this to be the law, and in support of the statement that subsequent creditors have no right to complain, the author cites Hollingshead v. Woodward, 35 Hun 410; Johnson v. Lullman, 15 Mo. App. 55, and Erskine v. Peck, 13 Mo. App. 280. And this statement and this section of Beach on Private Corporations is cited, in Hill v. Mining Co., 124 Mo. l. c. 167, as authority for that doctrine.

Thus it will be seen that Beach relies principally on the St. Louis Court of Appeals, and on this court, in Erskine v. Peck and Johnson v. Lullman, as his authority for so stating the doctrine, and afterwards in Hill v. Mining Co., this court relies on Beach as authority for the doctrine.

In Hollingshead v. Woodward, 35 Hun 410, it appeared that the company had issued to the defendant twenty-five shares of stock as a stock dividend based upon surplus profits. Afterwards this was cancelled before the plaintiff became a creditor. It was held that the defendant was not liable.

In Graham v. Railroad, 102 U. S. 148, it was held that: "Where a corporation, solvent at the time, and having no actual intent to defraud creditors, disposes of its *lands* for an inadequate consideration or by a voluntary conveyance, its subsequent creditors can not question the transaction."

In Morgan v. Lewis, 46 Ohio St. 1, the defendant sold a furnace to the company and took pay therefor in stock of the company. The company became dissatisfied with the furnace, and the sale was rescinded, the company giving back the fur-

Vol 168 mo—41.

nace and taking back the stock. It was held to be a good defense as against a claim by subsequent creditors for unpaid subscriptions on the stock.

In Insurance Co. v. Swigert, 135 Ills. 162, the question was the power of a receiver of a corporation to sue for unpaid subscriptions on stock where the stockholder by arrangement with the company had surrendered his stock and been released. It was held that as the company could not maintain such an action, the receiver (who was held to have no more power, under the law applicable to such cases in Illinois, than a voluntary assignee would have here) could not do so. The rights of creditors were not properly before the court, and, hence, it was only stated, at page 163 of the opinion, that such a surrender was fraudulent as to existing creditors, but that as between the surrendering stockholder and the company there was no longer any indebtedness on account of subscriptions for stock.

Trust Co. v. Abbott, 162 Mass. 148, was a bill against the executor of a deceased stockholder to compel specific performance of a contract of the deceased stockholder that upon his death the stock should be appraised and sold to the company. The questions involved in this case were not present in that case at all.

In Dunn v. Howe, 96 Fed. Rep. 160, it was held that under the statutes of Maine an assignee of an insolvent corporation can sue stockholders for unpaid subscriptions on stock. The questions under consideration in the case at bar were not present in that case, and what is therein said about "treasury stock," must be read in the light of the case in judgment.

On the other hand, it is contended by the plaintiff herein that neither the corporation, its officers nor stockholders have any power to agree with a subscriber for stock that his subscription be cancelled, unless such power is expressly given to them by charter or statute, and that unpaid stock subscriptions constitute assets of the corporation which all credi-

tors, existing or subsequent to the time of such attempted cancellation, have a right to look to for the payment of their debts, and that this right exists whether the creditor knew the fact that there were any such unpaid stock subscriptions when he extended credit to the company or not, the only exceptions to this rule being the right of the company to protect itself by forfeiting stock where the subscriber fails to pay for it, and in cases of a dispute between the company and the stockholder as to his liability, the matter may be compromised and the stock surrendered, if done in good faith. As to such exceptions, see Morawetz on Priv. Corp., secs. 125 and 114, and 2 Thompson on Law of Corp., sec. 1553, and see also sec. 961, Revised Statutes 1899, which provides substantially the same thing. In support of the general rule stated, the plaintiff aptly cites the following authorities: 1 Morawetz on Private Corporations, sec. 109, et seq; 2 Ibid., sec. 824, et seq.; 2 Thompson's Com. on Law of Corporations, sec. 1151, et seq.; Insurance Co. v. Floyd, 74 Mo. 286; Nichols v. Stevens, 123 Mo. 96; Ollesheimer v. Mfg. Co., 44 Mo. App. 172; Wells & Co. v. Thompson Mfg. Co., 54 Mo. App. 41; Shickle v. Watts, 94 Mo. 410; Rawhide Co. v. Hill, 72 Mo. App. 142; Skrainka v. Allen, 7 Mo. App. 434; s. c., 76 Mo 384; Gill v. Balis, 72 Mo. 424; Ramsey v. Mfg. Co., 116 Mo. 313; State ex rel. v. McGrath, 86 Mo. 239; Thompson v. Lake, 19 Nev. 103; Hamor v. Eng. Co., 84 Fed. 392; Putnam v. Hutchison, 45 Pac. Rep. 931; s. c., 4 Kans. App. 273; Allibone v Hager, 46 Pa. St. 48; Railroad v. Bowser, 48 Pa. St. 29; Alling v. Wenzel, 133 Ill. 264; Singer v. Given, 61 Iowa 93; Railroad v. Eastman, 34 N. H. 140; Upton v. Tribilcock, 91 U. S. 45; Crandall v. Lincoln, 52 Conn. 73.

To these cases it is only necessary to add Camden v. Stuart, 144 U. S. 1. c. 113-114, and Van Cleve v. Berkey, 143 Mo. 109.

In the case last cited, BRACE, J., speaking for this court, in an elaborate and exhaustive opinion, reviewed the cases

in this State and in other jurisdictions, and concluded as follows:

"Upon a review of all the cases decided by the appellate courts of this State since the adoption of the Constitution of 1875, the ruling in all of which will be found to be in harmony, it is impossible to escape the conviction that in this State, whatever may be the case in some of the other States, the American Trust Doctrine, as suggested by Mr. Justice HARLAN, has indeed been 'reinforced' by its Constitution and statutes; and that the proposition that the stock of a corporation must be paid for 'in meal or in malt,' in money or in money's value, is not a mere figure of speech, but really has the significance of its terms. It may be paid for in property, but in such case the property must be the fair equivalent in value to the par value of the stock issued therefor; that it is the duty of the stockholders to see that it possesses such value; that when a corporation is sent forth into the commercial world, accredited by them as possessed of a capital in money, or its equivalent, in property, equal to the par value of its capital stock, every person dealing with it, unless otherwise advised, has a right to extend credit to it on the faith of the fact that its capital stock has been so paid and that the money or its equivalent in property will be forthcoming to respond to his legitimate demands. In short, that it is the duty of the stockholder, and not of the creditor, to see that it is so paid; hence, the inquiry in a case between the creditor and a stockholder when property has been paid in for the capital stock of a corporation, is not whether the stockholder believed or had reason to believe that the property was equal in value to the par value of the capital stock; but whether, in point of fact, it was such equivalent."

In the opinion just referred to, the cases of Insurance Co. v. Floyd, 74 Mo. 286; Gill v. Balis, 72 Mo. 424; Ramsey v. Mfg. Co., 116 Mo. 313, and Upton v. Tribilcock, 91 U. S. 45, which hold that a corporation can not make an arrange-

ment with any of its stockholders by which they are to be released from the payment of their stock subscribed, or any part thereof, so as to affect the rights of the creditors, are cited, followed, approved and that doctrine firmly restated. The cases of Erskine v. Peck and Johnson v. Lullman, were distinguished in the Upton case, supra, and overruled as far as it was possible for that court to do so, and the contrary doctrince announced by the St. Louis Court of Appeals in Ollesheimer v. Mfg. Co., 44 Mo. App. 172, and in Wells & Co. v. Thompson Mfg. Co., 54 Mo. App. 41, was approved.

So that the law is now well settled in Missouri, as well as by the weight of authority in America, that unpaid stock subscriptions constitute an asset of an incorporated company, which all creditors, without regard to when their debts were contracted, have a right to look to and which can not be extinguished, released, given away, wiped out or impaired by any act of the corporation or the stockholder to the injury of the creditor except by his consent.

This is not only the legal rule but it conforms also to the demands of business integrity and honesty and is the logical sequence of the voluntary act of the stockholder flowing from his subscription. The statutes of this State authorize the formation of a business corporation—such as this company— only upon condition that all of the stock has been bona fide subscribed and that at least fifty per cent thereof has been paid up in lawful money of the United States (or in its equivalent). This is the statement and representation that is held out to the world by the incorporators, and their transferees, of every incorporated company. If the incorporators or stockholders could be allowed, as soon as the incorporation was completed, to sell out their stock to the company, and thereby escape liability for unpaid subscriptions, or in case the stock was fully paid, to receive back from the company the amount paid in, and to turn back to the company the stock subscribed, the doors for great frauds upon the creditors would be thrown

wide open, and the consequences would not only be disastrous to creditors, but would also be fatal to the corporations themselves, inasmuch as no one would deal with corporations under such conditions.

The statutes afford ample, honest and sufficient methods. for reducing the stock of an incorporated company, and the rights of creditors as well as the interests of such companies are fully protected. Such a proceeding as was resorted to in this case is wholly without legal authority or protection. Either the whole stock was only paid up to the extent of eighty per cent, or else there were one hundred shares subscribed for (of which the defendant McCoy had fifty) upon which not one cent was paid to the company by the subscribers, and for which the company paid the subscribers not one cent when it resolved to buy them back at one hundred dollars a share, and to make them "treasury stock."

The parties have treated these shares as absolutely unpaid shares, and they can not complain if the consequences of such a position are visited upon them. It is a legal solecism to say that any business corporation, under our law, can become the owner of shares in such corporation, which are wholly unpaid for. At least fifty per cent was paid thereon before the company was incorporated, or else the incorporators did not tell the truth, and the incorporation was a fraud upon the State. But it has passed into a legal truism in Missouri that so far as creditors are concerned, unpaid stock subscriptions constitute an asset of the corporation that can be subjected to the payment of the debts of the corporation. The American doctrine is that such unpaid stock subscriptions constitute, in equity, a trust fund in the hands of the directors of the corporation for the payment of debts. Strictly and technically, of course such unpaid subscriptions are not a *trust fund*, but are rather an *asset* of the corporation which it would be a fraud upon the creditors for the directors to dispose of in any manner or for any purpose except for the payment of the debts

of the corporation. And this being true the courts will undo the fraudulent transfer and gather in the asset for the benefit of the creditors.

From these considerations it follows that the instruction given by the court to the effect that if the stock subscription sued on was cancelled and surrendered by the defendant with the consent of all the stockholders of the company prior to the time the debt in suit was contracted, the plaintiff can not recover, was erroneous, and that on the contrary the defendant is liable to the creditors of the company, without regard to when their debts were contracted, for the unpaid subscription for such stock, and that the attempted surrender and cancellation of the subscription and the purchase of such stock by the company as "treasury stock," is void, and of no more effect than if no such thing had ever been attempted, and that the plaintiff is entitled to a judgment, unless some of the other defenses are well founded.

## II.

It is next argued that this proceeding is barred by limitation.

Article 9 of chapter 12, Revised Statutes 1899, regulates the formation of business companies and provides for the duties and responsibilities of the stockholders thereof. Section 1330 thereof contains a special statute of limitations applicable alone to such companies, as follows:

"No stockholder shall be personally liable for the payment of any debt contracted by any corporation created under this article, which is not to be paid within one year from the time the debt is contracted, nor unless a suit for the collection of such debt shall be brought against such corporation within one year after the debt shall become due; and no suit shall be brought against any stockholder who shall cease to be a stockholder in any such corporation for any debt contracted,

unless the same shall be commenced within two years from the time he shall cease to be a stockholder in such corporation, nor until an execution shall have been returned unsatisfied, in whole or in part."

In Hauser v. Thompson, 56 Mo. App. l. c. 94, the St. Louis Court of Appeals said this section of the statutes "is a dead branch which has escaped the pruning knife of the revisors." The reasoning employed to reach this conclusion is this. This provision of law was originally enacted in 1855, and appeared as section 22 of chapter 37, Revised Statutes 1855. Section 10 of that chapter provided that the stockholders should be personally liable for the debts of the company until the whole stock was paid in. Section 18 of that chapter required a notice to be printed annually showing the condition of the company and, specially, the amount of its existing debts, and for a failure to publish such notice, that section of the law made the stockholders jointly and severally liable for all existing debts of the company and for all that might be contracted before such notice should be given. Section 21 of the act made the stockholders liable for all debts in excess of the amount of the capital took. The Constitution of 1865 imposed a double liability upon stockholders. The amendment to the Constitution adopted in 1870 abolished the double liability of the stockholders. Afterwards the liabilities imposed by sections 10, 18 and 21 of the Act of 1855 were abolished. Upon this predicate the St. Louis Court of Appeals bases its conclusion that the personal statutory liability of a stockholder in this State was obliterated, and that section 22 of chapter 37, Revised Statutes 1855 (now section 1330, R. S. 1899) has been allowed to remain on the statutes through inadvertence.

It will be observed that the language of the section under consideration is that "no stockholder shall be personally liable for the payment of any debt contracted by the company," unless it was to be paid within one year, nor unless suit be brought

against the company within one year after the debt becomes due, nor unless suit be brought against the stockholder within two years after he ceases to be a stockholder.

The stockholders under the Act of 1855 were made personally liable for the debts of the company, without regard to their amount or the stock owned by them, under three circumstances, to-wit: first, until the capital stock was fully paid in (sec. 10, ch. 37); second, for all existing debts if the annual statement was not published and for all debts that might be contracted before such statements were published (sec. 18, ch. 37); and, third, for all debts contracted in excess of the amount of the capital stock of the company (sec. 21, ch. 37).

These were the three classes of debts that stockholders were made personally liable for under the Act of 1855, and these are the kind and extent of the debts that are referred to in section 22 of that act, as to which actions were limited.

Unpaid stock subscriptions are debts of the stockholders to the company, and are in no sense debts of the company. The stockholder is liable for these because these are his debts, and not because they are debts of the company for which the statute has made him individually liable. Therefore, section 22 of chapter 37, Revised Statutes 1855 (now section 1330, R. S. 1899) has no application whatever to suits against a stockholder for the recovery of his unpaid stock subscriptions.

The general law of 1855 applicable to all corporations, prescribed (sec. 13 of art. 1, chap. 34, R. S. 1855, p. 372) that in case of a deficiency of corporate property, the individual property of the stockholders to an amount equal to his stock and no more, might be seized to pay the corporate debts, and that such liability should continue for one year after the record of the transfer of the stock and for six months after judgment rendered against the corporation, provided the suit was commenced within the year after the stock was transferred. But it was never contended that the special limitation prescribed by section 22 of chapter 37, Revised Statutes 1855,

had any application to the liability created by section 13, of chapter 34, Revised Statutes 1855.

In Adamson v. Davis, 47 Mo. 268, the proceeding was under section 13 of article 1 of chapter 37, 1 Wagner Statutes 1870, p. 291, which provided that if an execution should be issued against a corporation and no property be found out of which to make the debt, then upon motion an execution might issue against any stockholder to an amount equal to the amount of stock owned by him, together with any amount unpaid thereon. At that time what was section 22 of the Act of 1855, was section 13 of article 7 of chapter 37, 1 Wagner Statutes 1870, p. 336, and this court applied the limitation prescribed by that section to the personal liability for the debts of the company imposed by section 13 of article 1 of chapter 37 aforesaid, which related to all kinds of corporations.

The liability imposed by section 13 of article 1 of chapter 37, 1 Wagner Statutes 1870, p. 291, is still imposed by law in Missouri, except that it is confined now to any unpaid balance due on stock. [Sec. 985, R. S. 1899.] That is, it is limited to the contractual liability of the stockholder and not to the statutory liability of the stockholder for the payment of the debts of the company. Hence, while there was room for applying the statute of limitations (sec. 13, art. 7, chap. 37, Wagn. Stats. 1870) to the liability under consideration in that case, there is none for applying the statutory limitation (sec. 1330, R. S. 1899) to the liability whose enforcement is provided for by section 985, Revised Statutes 1899.

It follows therefore, that the claim that the liability of the defendant for unpaid stock subscriptions is barred by limitation, is not tenable.

## III.

The trial court declared the law to be that if Simpson is not the bona fide owner of the judgment in his own right, but

holds the same for the benefit of Gudgell, then the plaintiff, Simpson, can not recover in this suit.

Section 540, Revised Statutes 1899, requires every action to be prosecuted in the name of the real party in interest, execept as provided in section 541, and that section provides that an executor or administrator or a trustee of an express trust may sue in his own name without joining with him the person for whose benefit the suit is prosecuted, and further provides that "a trustee of an express trust, within the meaning of this section, shall be construed to include a person with whom or in whose name a contract is made for the benefit of another."

The evidence in this case creates an irresistible conviction that Gudgell and not Simpson was the real purchaser of the judgment. No money was paid by any one to the bank for the judgment. The note of Simpson and Gudgell was given to the bank in payment for the judgment, and so far as appears that note has never been paid. Simpson and Gudgell lived in the same house, and were partners in the cattle business. Gudgell was guarantor to the bank of the indebtedness of the Independence Wool Manufacturing Company. Simpson knew that the company had nothing. He knew nothing about the liability of any stockholders for unpaid stock subscriptions. His testimony clearly shows he was simply trying to help Gudgell and expected Gudgell to protect him. The bank, however, made no contract with Simpson for the benefit of Gudgell, and, therefore, Simpson is not the trustee of an express trust. The conclusion is irresistible that Gudgell is the real party in interest, and that Simpson is not a trustee of an express trust within the meaning of the statute, and, therefore, he is not entitled to maintain this action. The plaintiff, however, contends that even if Gudgell be the real party in interest, he would be entitled to recover because he succeeded to the rights of the bank and as the bank would have been entitled to recover he can recover notwithstanding his personal knowledge of all the facts, and notwith-

standing he might not be entitled to recover in his own right. But, however this may be, it is enough now to say that Gudgell is not a party to this suit, and would not be bound by anything that is done in this case. It will be time enough to adjudicate Gudgell's rights when Gudgell properly invokes the aid of the court. In the meantime, as the trial court evidently found, and properly found under the evidence, that Simpson is not the real party in interest, but that Gudgell was the real party in interest, that puts an end to this case, and, therefore, the judgment of the circuit court is affirmed. All concur.