The J. K. Siphon Ventilator Company v. Hutton.

Opinion delivered February 8, 1915.

1. CORPORATIONS—TRANSFER OF STOCK—LOAN OF MONEY—INTENTION OF THE PARTIES.—One R., a large stockholder in a corporation, turned into the treasury two hundred shares of stock which were then transferred to appellee, who paid $5,000 therefor. *Held*, under the evidence, the transaction was a loan by appellee to the corporation of the sum named, and that the stock was given to him as security.

2. CORPORATIONS—ACTS OF DIRECTORS—BINDING EFFECT ON STOCKHOLDERS.—Acquiescence by a stockholder in the action taken by the directors of a corporation separately, and when such action was carried out by the corporation, is sufficient to render the acts valid.

3. CORPORATIONS—ACTION OF BOARD OF DIRECTORS—RECEIVING MONEY—ESTOPPEL.—A corporation will be bound by a contract made by its board of directors, even though the meeting at which the contract was authorized was not legally called, where the corporation is the beneficiary of the proceeds of the contract authorized at that meeting and received the funds and appropriated them to its own use. The corporation is, therefore, estopped from setting up the invalidity of the contract.

4. CORPORATIONS—ACTS OF OFFICER—ACCEPTING BENEFITS—ESTOPPEL.—If an officer of a corporation or other person assuming to have power to bind the corporation by a given contract, enters into the contract for the corporation, and the corporation receives the fruits of the contract and retains them, after acquiring knowledge of the circumstances attending the making of the contract, it will thereby become estopped from afterward rescinding or undoing the contract.

5. CORPORATIONS—DEBTS—FORM OF OBLIGATION.—In the absence of express limitations a corporation has the implied power to borrow money to carry out the purposes of its organization and to execute evidences of its indebtedness and to give security therefor; it may bind itself by any form of obligation not forbidden by its charter.

6. CORPORATIONS—LIABILITY FOR MONEY BORROWED—INTEREST.—Where a transfer of stock in a corporation, in consideration of a sum of money received, was held to constitute a loan to the corporation and not a sale of the stock, an agreement with the lender, guaranteeing him a ten per cent dividend, will be treated as an agreement to pay ten per cent interest on the loan.

7. EVIDENCE—AMOUNT OF JUDGMENT—NOTE.—Where defendant owed plaintiff a sum of money and gave plaintiff a note for the amount, in an action by plaintiff to recover the same, the note will be

treated as an admission by the defendant of the amount due plaintiff, up to the date of its execution.

Appeal from Pulaski Chancery Court; *J. E. Martineau,* Chancellor; affirmed.

### STATEMENT BY THE COURT.

On the 25th of February, 1914, a contract was signed by the appellant and the appellee, which, omitting formal and unnecessary matters, provided as follows: "That for and in consideration of the purchase for cash by the party of the second part of two hundred (200) shares of the capital stock of party of the first part, amounting to five thousand dollars ($5,000), party of the first part hereby agrees with, and guarantees to, party of the second part the following:

1. Party of the second part will receive yearly upon said stock a dividend of not less than 10 per cent.

2. Party of the second part shall be elected a director and secretary of party of the first part.

3. Party of the second part shall receive a salary amounting to one-fourth of that paid to any other officer or employee of party of the first part.

4. All of the stock of party of the first part shall at all times be of the same class, and each share be entitled to the same dividend.

5. The total amount of indebtedness against party of the first part does not at any time exceed the sum of two thousand dollars ($2,000).

6. The affairs of party of the first part shall at all times be conducted in a business-like manner, and that no extravagant debts shall be created by party of the first part.

7. Party of the second part shall have the right to object to the sale, transfer or pledge of any of the stock of any stockholder of party of the first part to any other person, firm or corporation.

8. Party of the second part shall have the right at any time to withdraw the amount invested by him, if he sees fit to do so, upon tendering back the certificates of stock held by him, and shall be paid in cash at face value

of said stock, upon reasonable notice.'' Signed by the appellant, through J. K. Robinson, as president, and by the appellee.

Endorsed on the above contract was the following: ''We, the undersigned, who constitute the stockholders of the above named company, having read the above and foregoing contract, hereby consent to the making thereof by said company. (Signed) ''J. K. Robinson, Nick Peay.''

Robinson and Peay also signed the following as a guarantee: ''In consideration of the sum of one dollar and other valuable considerations paid us by W. G. Hutton, receipt of which is hereby acknowledged, do hereby, for ourselves, our heirs and administrators, bind ourselves, singly and jointly, as sureties for the faithful performance of the above and foregoing guaranty.''

On the 5th of June, 1914, the appellee instituted this suit against appellant, alleging that appellant was a corporation organized and doing business under and by virtue of the laws of the State of Arkansas; that appellant was indebted to him in the sum of $5,000, with interest from February 25, 1914, for borrowed money, and also in the sum of $81.25 for salary. He alleged that the appellant was insolvent, and prayed that a receiver be appointed to take charge of the assets and to pay all the claims owing by the appellant, and for all proper relief to which he in equity and good conscience might be entitled.

Appellant, in its answer, denied that it was indebted to the appellee for borrowed money in any sum; admitted that it was due the appellee the sum of $81.25 for salary. It denied that it was insolvent and set up ''that on or about the 25th day of February, 1914, the appellee purchased from said J. K. Robinson $5,000 worth of his individual stock; that the stock had been issued in large denominations; that at appellee's request J. K. Robinson returned to the treasury his stock, and stock in the sum of $5,000 was issued to the appellee, who accepted the same, and had continued in the possession thereof; that

on the same day the appellee was elected by the board of directors a director of the company; that Robinson and Peay entered into an agreement with the appellee whereby they agreed to repurchase the stock purchased by appellee and undertook to have the appellant agree to repurchase the stock by signing the agreement set out above; that the appellant did not authorize the agreement, and that the same was void, the appellant having no authority to repurchase its stock.

The appellant filed a demurrer to the jurisdiction, but afterward waived all questions of jurisdiction, and by consent of all parties the testimony was taken before the chancellor *ore tenus* and was reduced to writing and made a part of the record.

It was shown at the hearing that appellant is a manufacturing corporation, organized under the laws of Arkansas on the 23d day of December, 1913, with a capital stock of $100,000, divided into 4,000 shares, of which J. K. Robinson owned 2,399 shares, Guy Robinson, his son, one share, and Nick Peay 1,600 shares. The business of the corporation was the manufacture and sale of a patent ventilator. The patent right, which belonged to J. K. Robinson, was valued at $75,000, and machinery belonging to Nick Peay was put in as part of the capital stock and valued at $25,000, making the paid-up capital stock of $100,000, divided among the incorporators at the organization above named.

The appellee testified that Robinson and Peay approached him to borrow some money, representing that they were making a wonderful success of their company, and stating that they needed some money but could not borrow the same at the bank because it was not a bankable proposition; that they wished the sum of $5,000 if appellee would loan the same to the company, and Peay stated that they would guarantee appellee as much as 35 or 40 per cent to be paid on easy dividends. Appellee stated that he did not want any guarantee of that kind, but that if he loaned the money he would want the assurance of getting the money back with 10 per cent interest on it.

They told appellee to get them the money and they would
guarantee it. Appellee arranged for the money at the
bank on condition that they were to pay it back to him on
demand. The contract was to be drawn up by appellee's
attorney, and was thoroughly understood by all of them.
The contract above set out was entered into and was
signed by all of the parties whose names appear thereto
before the money was paid over. It was read over by
every one of them and agreed to. Nick Peay and Rob-
inson and all understood the contract. Before the con-
tract was signed Robinson and Peay stated that they
wanted the money to pay for the machinery they had or-
dered, and it was understood that every nickle of the
money was to go to the company. Robinson at that time
stated that he had promised to give Carl Bentley $1,000,
but that he had not given the stock to him at that time.
J. K. Robinson also stated at the time in regard to Guy
Robinson, ''He is my boy, and he will resign and you will
be the secretary'' (meaning appellee). Before Robinson
and Peay stated that Guy, who was absent, would sign
the proposition and agree to everything in it, both Rob-
inson and Peay stated, ''Now, you get your lawyer to
write these minutes up the way they ought to be; all we
want to do is to secure you for your money.'' It was a
$5,000 transaction in which they simply wanted to secure
appellee. They further stated, in regard to the meeting
of the stockholders, ''We waive the formality of a spe-
cial call meeting, or, at least, sending out notices to the
stockholders. We are all here and have got to get this
money immediately, and we will waive the formality of
sending out notices.''

The witness then testifies that he and Mr. Wooten
afterward prepared the minutes, which were dated as of
the date of the contract, in accordance with the agreement
between them, and exhibited these minutes. The min-
utes, among other things, after reciting that Robinson
held 2,399 shares and Nick Peay 1,600 shares, recited that
Nick Peay offered a resolution to the effect that it was
necessary to create a cash fund ''for the purpose of com-

pleting existing contracts and for successfully carrying on the operations of this company," and that J. K. Robinson had turned back into the treasury of the company 200 shares of the stock held by him free to the company. The minutes then recited that Hutton (appellee) offered to purchase 200 shares of the stock at its face value of $5,000 cash, "upon the company's entering into a written contract with him to guarantee him certain returns upon his investment; that the company accepted said 200 shares of stock from said J. K. Robinson, free of cost, and that the president and secretary be authorized to enter into the contract with Hutton; that Hutton produced the contract referred to above and the same was executed by all parties, $5,000 in cash being paid by Mr. Hutton to the treasurer and 200 shares of stock being issued to him therefor;" that Robinson tendered his resignation, and that Hutton was appointed by the president to fill the vacancy.

The minutes further recited that at the same meeting the monthly salaries were directed to be paid as part of the operating expenses, as follows: J. K. Robinson $100, Nick Peay $100, and W. G. Hutton $25.

Appellee then states that some time in April he visited the plant and looked over the order books and discovered that the representations that they had made about getting $100,000 worth of orders were not true. He became dissatisfied with the way they were running the business and asked them to give him his money and he would get out. It was understood at the time the contract was entered into that they were to have reasonable notice if appellee should demand a return of his money, and it was thoroughly understood between them that three or four days would be reasonable time. Appellee waited until April 12, and then wrote them a letter, addressed to the company, calling its attention to clause 8 of the contract, giving appellee the right at any time to withdraw the amount invested by him if he saw fit to do so upon tendering back the certificates of stock upon reasonable notice. He stated in the letter that he desired a return

of the money paid by him for the stock issued to him, towit, $5,000, and tendered to the company the certificates representing said stock.   He expressed dissatisfaction because one of the stockholders had pledged his holdings without giving appellee an opportunity to object to it, contrary to the stipulation of their contract.   He closed the letter by demanding a salary of $6.25 per week from February 25, 1914, and the $5,000 and interest on the same at 10 per cent from the same date.   This letter was served on J. K. Robinson, as president of the company, by a deputy sheriff.

The appellee further stated that all he wanted was his money; that he felt kindly toward Robinson and Peay personally, but that he did not want to see the company put in the hands of a receiver.

On cross-examination, appellee admitted that the minutes were prepared in accordance with the understanding; that the parties signed up the contract, and they handed him the stock as additional security, saying that they wanted him with them, that they were all friends and would work harmoniously together.   He did not want any job in the company except to protect himself in getting his money, and he accepted the secretary's place with that in view, but he accepted the secretary's position in good faith all the way through and expected to go down and help in any way he could.   He was elected as director at the meeting, according to the contract, and the contract speaks for itself.   It was understood that the minutes were to be made up so as to reflect the contract between them and appellee acquiesced in it.

Appellee was asked this question: "Whose stock did you understand you were getting that day?" and answered, "I only knew the company.   I didn't know whose when I was buying.   I didn't ask them or anything else."

The certificate that was delivered up was in the name of Guy A. Robinson, secretary, and Jas. K. Robinson, president, and was issued to appellee.   They had already prepared it and handed in to appellee.

The testimony of June P. Wooten, a practicing attorney, who represented W. G. Hutton, states that he was present at the meeting of the "J. K." Siphon Ventilator Company on February 25, 1914, when Hutton paid the company the sum of $5,000. Hutton had explained the matter of the negotiations between himself and the company relative to letting it have the $5,000. Witness prepared the agreement between them. The witness says: "The matter was gone over thoroughly between us, and I got the understanding, as I suppose, from both parties about what was to be done and what sort of an agreement was to be drawn for the signatures of both parties. The agreement as written out and signed by all the parties was reached."

The witness corroborates substantially the testimony of appellee, whom he represented in the negotiations. He states that he had personal knowledge of who constituted the stockholders. He states that at the meeting, after the contract had been signed by Nick Peay and J. K. Robinson, they stated that Guy A. Robinson, the other stockholder, knew of the proposed agreement and that he was willing for the agreement to be made and would sign the same at any time it was presented to him. J. K. Robinson stated also, at that time, "that he had promised Dr. Carl Bentley $1,000 worth of the shares of the company in payment of a personal debt which he owed to Doctor Bentley."

The witness, continuing, says: "I explained that that being true, the stock not already having been issued, it would not be necessary to have Doctor Bentley's signature at this time; that when the stock was issued to him Mr. Robinson could explain that such an agreement had already been entered into. At the same meeting Mr. J. K. Robinson and Mr. Nick Peay stated that the stock then owned by them was held by them, none of it having been put up as collateral or having been transferred to any one."

The witness then proceeds to show that it was understood and stated that the money was for the ventilator

company and for its use alone.   He represented Hutton
in the effort to have the money repaid and prepared the
letter in the form of a notice to the company, and he tells
of the efforts that he thereafter made to have Robinson
and Peay settle the indebtedness; and that to this end he
represented Hutton and obtained an agreement with Rob-
inson and Peay by which they were to execute a sixty-day
note in the sum of $5,193, the indebtedness of the company
to the appellee at that time; that he prepared the note,.
which was signed by the company by J. K. Robinson, its
president, and by Robinson and Nick Peay; that it was
understood and specified in the note that Robinson had
deposited and pledged as collateral security for the pay-
ment of the note certificates of stock of the face value of
$46,000; that Robinson, afterward, the following morning
after the note had been signed, stated that after a confer-
ence with his attorney he did not desire to attach the stock.
The witness then stated that he would retain the note as
an evidence of the acknowledgment of the indebtedness.
The witness further testified as to the minutes that Rob-
inson and Peay told him "to draw any kind of minutes
which, in his judgment, would protect the money of Mr.
Hutton," and that he drew the minutes in conformity
with the understanding had between all the parties, and
that the minutes "substantially stated what took place
in fact, though the same may not have taken place in ac-
tual words and phraseology."

Nick Peay, on behalf of the appellant, testified that
he was vice president of the company, and owned $40,000
worth of its stock.   He stated that at the time the contract
in evidence was signed there had been no transfer of his
stock, and that he pledged the stock as additional security
for the sum of $5,000 which he had borrowed of the State
National Bank.   The contract in evidence represented
the contract with the different parties to it.   It was re-
duced to writing by Mr. Wooten, Mr. Hutton's attorney,
at the instance of Mr. Hutton, inasmuch as the obligation
was to him.   He states that Robinson, Hutton and Wooten
were present; that J. K. Robinson, Guy Robinson and

himself were the stockholders. Guy Robinson was not present. His resignation as secretary was tendered by J. K. Robinson. There was no notice given witness of a stockholder's meeting.

In regard to the $5,000 transaction with appellee, witness says: "Mr. Hutton says, 'Nick, are you fellows going to sell any of the stock?' and I says, 'I have got $40,000, Bill, and there ain't any of it for sale, and Robinson has got approximately $60,000, and neither of us want to sell any of the stock unless we have got to.' 'Well,' he says, 'that looks pretty good to me.' So when it came time that we thought the sale of this stock would be of benefit, I suggested to Robinson to sell him (Hutton) this stock, and he told me to go down and see him and see if he still wanted it, and I did, and after talking it over Mr. Hutton bought the stock. The facts show for themselves, whether it was a sale or a loan. The written contract shows what it was." He then tells about the execution of the note signed by the company, by Robinson as president, and himself and Robinson individually, when Mr. Wooten, for the appellee, was pressing them for the payment of the amount that Hutton claimed to be due him.

On cross-examination the witness stated that Hutton let the company have the money in good faith; that the company used every cent of the money in its business. Witness was willing at that time to protect Mr. Hutton in every way possible, and was still willing. Witness was asked the following questions:

Q. Didn't you state to me on several occasions that the company owed it? A. I may have said we owed him, and, of course, Robinson and I are virtually the company.

Q. Do you mean to say, now, that you and Mr. Robinson are the company? A. We were the company.

Q. Do you mean to leave the impression that you and Mr. Robinson individually were to redeem, or the company would? A. It amounts to one and the same thing.

Q. That is what I am asking you, if you didn't acknowledge to me that the company did owe him the

money? A. I don't know whether you call it the company or not; it was he and I, and we owned the company.

Q. When you said "we," did you mean Mr. Robinson and you individually, or did you mean the company? A. I presume it was me and him; we had the total stock.

Q. Then you don't deny that the company owes the money, do you, under your written agreement? A. I don't think I am competent to say.

Q. Have you ever denied that the company owed the money? A. That would be a construction to be placed by the court, I should say, Mr. Wooten.

Q. I am asking you, as a matter of fact, whether you didn't admit on several occasions that the company owed him the money and would pay it? A. Well, the company had given its note for it, hadn't it?

Further on in his testimony, on cross examination, he said, in answer to questions, that he was not competent to acknowledge the debt for the company. He was asked if up to a certain period he had not acknowledged that the company owed the money, and answered, "Well, I don't know whether you call it the compnay or not. I acknowledged that Robinson and I owed it."

When asked why he and Robinson signed the name of the company to the note for $5,193, of date May 30, 1914, he answered: "Well, the presumption would be that we signed that to strengthen the note." He further says, in answer to questions, that the company's name was signed by Robinson and he signed individually. Robinson signed the company's name in witness's presence and with his approval, and he and Robinson were two of the three of the board of directors.

Witness was asked further along if he and Robinson did not give Wooten, as the attorney for Hutton, authority to "draw the proceedings of the minutes of that meeting to protect Hutton in every possible way?" and answered, "Yes; we told you to draw those minutes to assure what protection was necessary to Mr. Hutton." Further on in his testimony, in answer to questions propounded by the court, he stated that Robinson was paid

the money; that the checks were given to Mr. Robinson; he didn't know to whom they were payable; he did not deposit them.

Robinson testified that the agreement of February 25 was the only agreement that he had with appellee; that the stockholders of the company at that time were Nick Peay, Doctor Bentley, Guy Robinson and himself. Bentley got his stock on the 17th of February and Hutton got his on the 25th. Witness testified that the recital in the minutes to the effect that Robinson had turned back to the treasurer of the company 200 shares of stock was not correct; that was never done. Appellee did buy 200 shares of the stock. Witness stated that they guaranteed Hutton a dividend; that Guy Robinson never tendered his resignation, and knew nothing of it, but witness said he would have him to resign. The company, as a company, never acknowledged any indebtedness on the part of the company to Hutton. Hutton bought $5,000 worth of witness's stock. He handed witness two checks of $2,500 each, payable to the appellant company, and these were deposited in the bank to the credit of the company. Peay and witness agreed to repurchase the stock on reasonable notice, and witness thought a year's notice would be reasonable. About a month after the transaction witness notified Guy Robinson of what had been done and got him to resign, telling him that he had appointed Mr. Hutton in his place.

The record shows that in order to obviate the appointment of a receiver, at the time the decree was rendered the question of the insolvency of the appellant was held in abeyance and all parties agreed that the court should render a final decree on the validity of plaintiff's claim, and expressly waived all questions of jurisdiction. The court entered a decree in favor of the appellee for $5,193, with interest at 10 per cent from May 30, 1914, until paid. To reverse this decree, appellant duly prosecutes this appeal.

*J. A. Comer* and *J. W. Blackwood,* for appellant.

1. There was no meeting of the stockholders, nor of the board of directors, lawfully convened, so as to bind the corporation for the payment of the debt, but it was merely a sale of stock to appellee and no one was bound except J. K. Robinson and Nick Peay personally. 55 Ark. 477; 54 Ark. 58-60; 96 Ark. 300; 62 Ark.

2. Robinson and Peay stood in a fiduciary relationship to the minority stockholders and creditors and their agreement attempting to guarantee 10 per cent dividends on appellee's stock, to make him a director and pay him a salary as secretary and to return him his money at all hazards, was against public policy and void. 120 Mass. 501; 15 Am. & Eng. Enc. of L. (2 ed.), 947, *et seq.;* 135 U. S. 507; 34 L. Ed. 254, 257, 258; 31 L. R. A. 557-564; 62 S. W. 795.

3. If this contract was with Peay and Robinson, they are not sued in this action; if it was made or attempted to be made in the name of the corporation, it is void and can not be enforced. 149 S. W. 1162; 24 Mo. App. 338; 25 *Id.* 184; Kirby's Dig., § 860. If, as is alleged in the complaint, the corporation is insolvent, then the right of creditors is involved. 68 S. W. 1029.

*June P. Wooten,* for appellee.

1. Under the circumstances, shown in this case, the law presumes that notice of the meeting was given to Guy Robinson. 1 Thompson on Corp., § 538. He having been told by his father of the meeting and of the proceedings, and having made no objection to lack of notice, waived the alleged irregularity and acquiesced in the proceedings. J. K. Robinson having been present and participating in the meeting, can not raise the objection of irregularity for himself, nor for another stockholder. 1 Thompson on Corp., § § 824, 825; 22 L. T. 400; 3 Kay & J. 408; 139 U. S. 417, 35 L. Ed. 227.

Even if the action of Peay and Robinson was done by them as individuals, if it was actually carried out and Guy A. Robinson acquiesced, it was valid. 2 Thompson

on Corp., § 1074; 44 W. Va. 175; 28 S. E. 730; 62 Kan. 463; 63 Pac. 756; 30 Wash. 147; 70 Pac. 247.

The action taken was really by the board of directors, notwithstanding the term "stockholder" was used in the minutes, and the board had authority to borrow money the same as an individual. 3 Thompson on Corp., § § 2165-67; 10 Cyc. 1100-1102, 1104. See also on the question of acquiescence and ratification, 10 Cyc. 1066-69, 1072, 1075-77; *Id.* 1080; 2 Thompson on Corp., § 1071; 107 Ala. 572; 18 So. 137; 30 Wash. 147; 70 Pac. 247; 44 W. Va. 175; 62 Kan. 463.

2. This is not a case of a corporation decreasing its capital by purchasing its own stock, but a case where all of the stock had been fully paid for and issued, and the transaction was one which enabled the corporation to raise funds with which to operate its plant. No creditors rights were involved, and, all the stockholders agreeing to it, the transaction was legal. 10 Cyc. 452-456; *Id.* 1109; 97 Wis. 585; 73 N. W. 333; 4 Thompson on Corp., § § 4075, 4080.

3. The court did not err in holding that the notice given by appellee for a return of his money was reasonable. The reasonableness of the time was a question of fact for the chancellor. 10 Cyc. 1077, 1078.

Wood, J., (after stating the facts). (1) The first question to be considered is as to whether or not the transaction was a purchase of stock of the corporation or a loan of money to the corporation.

While the negotiations between the appellee and the parties representing the appellant culminated in a contract which recites that the $5,000 was "in consideration of the purchase for cash of 200 shares of the capital stock," and while there are other recitals which, unexplained, would tend to show that the transaction between the appellant and the appellee was a sale of stock and not a loan, yet when the contract is viewed in the light of the testimony of the witnesses who conducted the negotiations, we are of the opinion that the chancellor was cor-

rect in treating the transaction as a loan on the part of the appellee to the appellant.

The testimony of Peay, and the testimony of appellee himself, and of his attorney, leaves no doubt of the fact that it was the intention of the parties to the contract that appellee should advance to the corporation, to be used for its purposes alone, the sum of $5,000. The testimony shows that appellee advanced this sum, and that it was received by the appellant and used by it.

While J. K. Robinson testifies that it was his stock that was sold to the appellee, the contract itself and the testimony of the other witnesses and the minutes of the corporation which were drawn to reflect the proceedings of the meeting, show that the 200 shares of stock that were delivered to appellee were turned by Robinson into the treasury of the company. In other words, the effect of all the testimony, except that of Robinson, was to show that Robinson, in order to induce the appellee to advance the money for the corporation, donated 200 shares of his stock to the corporation to be given to appellee and to be held by him as security for the money he had advanced on behalf of the corporation. The corporation, at the time the negotiations were pending, had no treasury stock; all its stock had been issued and was paid up. That Robinson himself considered the transaction as a loan to appellant is shown by the fact that he afterward signed appellant's name to the note which included the $5,000 advanced by appellee.

As we view the contract, so far as the $5,000 is concerned, it creates a liability on the part of the appellant in favor of the appellee for this sum, with interest at the rate of 10 per cent per annum, payable to appellee upon demand, after reasonable notice, upon the appellee tendering back to the appellant the certificates of stock held by him. This construction clearly reflects the intention of the parties to the transaction, and the chancery court did not err in so holding.

The appellant contends that, even though the transaction be treated as a loan, that the contract was void be-

cause Guy Robinson, one of the directors, had no notice of the meeting when the contract was executed, and that there was therefore no legal meeting of the directors, and that it was also void because there was no legal meeting of the stockholders.

(2)   Endorsed on the contract itself was a statement, signed by Robinson and Peay, to the effect that they constituted the stockholders of the company and consented to the contract.   A clear preponderance of the testimony shows that at the time the contract of February 25 was executed the stockholders of appellant were J. K. Robinson, Guy Robinson, his son, and Nick Peay.   J. K. Robinson and Nick Peay owned all of the stock except one share held by Guy Robinson, and it is manifest that this one share was simply held by him in trust for the purpose of the organization.   For J. K. Robinson, at the time of the meeting, treated this one share as his own stock in making the negotiations with the appellee and permitted appellee to hold same in order to elect him secretary, and there was never any objection to this on the part of Guy Robinson.   True, J. K. Robinson testified that at the time the contract was executed Doctor Bentley owned forty shares of the stock, but his testimony in this respect is contradicted by his own statement in writing endorsed on the contract and by the testimony of the other witnesses who were present.   At the time of the meeting, therefore, and when the contract was consummated all of the stockholders and the directors were present or represented. But if Guy Robinson had in fact any beneficial interest in the share of stock held by him, the evidence shows that he was notified of what was done, and it was not shown that he objected to the transaction.   His testimony was not taken.   The minutes recite that notice in writing was waived by each of the stockholders.   It must be held, under these circumstances, that Guy Robinson had notice of the meeting of the directors, or that if he did not have notice, when he was told by his father of the transaction and made no objection thereto, he acquiesced in and rati-

fied the same. See 1 Thomp., Corp., § § 824-25. He is estopped from gainsaying it. 10 Cyc. 1066.

"Acquiescence by stockholders in the action taken by the directors separately and where such action was carried out by the corporation was held sufficient to render the acts valid." 2 Thompson on Corporations, § 1074, and cases cited in note.

(3) But a conclusive answer to the contention urged by counsel that the contract was void because the board of directors was illegally convened is that the appellant was the beneficiary of the proceeds of the contract that was authorized at that meeting. Knowing the facts, it received the funds from the appellee and appropriated them to its own use. It is therefore estopped from setting up the invalidity of the contract.

(4) Estoppel by written contract or *in pais* operates against corporations in like manner as natural persons. The law is accurately stated in 10 Cyc., pp. 1067, 1068, as follows: "If an officer of a corporation or other person assuming to have power to bind the corporation by a given contract enters into the contract for the corporation, and the corporation receives the fruits of the contract and retains them after acquiring knowledge of the circumstances attending the making of the contract, it will thereby become estopped from afterward rescinding or undoing the contract." See also pp. 1065-66.

The appellant contends that those paragraphs in the contract by which the appellant guarantees to appellee 10 per cent dividend on the stock held by him and to make him a director and pay him a salary as secretary, and to return to him his money at all hazards, render the contract void as against public policy. If the transaction under consideration were a sale and purchase of stock instead of a loan, then there would be ground for appellant's contention. But, treating the transaction as a loan, it was within the power of the directors to make it in this form and to prescribe these or any other terms by way of inducement to appellee to enter into the contract and for his satisfaction and security after he had done so.

(5)    In the absence of express limitations a corporation has the implied power to borrow money to carry out the purposes of its organization and to execute evidences of its indebtedness, and to give security therefor. It may bind itself by any form of obligation not forbidden by its charter. See 10 Cyc., pp. 1102-1104; 3 Thompson on Corporations, §§ 2165-7.

Concerning the validity of the contract under review it must not be overlooked that the naked question before us is as to whether or not that contract makes appellant liable to the appellee. While the complaint alleges the insolvency of the appellant, the answer denied it, and by the agreement of counsel this question was not submitted, and as to whether or not there were other creditors of appellant besides the appellee, or as to what effect the contract would have on the rights of creditors generally was not involved.

(6)    The appellant contends that the clause in the contract guaranteeing appellee a dividend of 10 per cent on the stock held by him was a fraud upon the minority stockholders. This is not well taken, for another clause in the contract gives to all the stockholders the same dividend. Moreover, treating the transaction as a loan, this was but a provision whereby appellee was to receive 10 per cent per annum on his loan. Besides, at the time this transaction was entered into there were no minority stockholders who were not present or represented in the meeting and consenting to this provision. They are therefore bound by it. The testimony of J. K. Robinson that Bentley was a stockholder at this time is contrary to the clear preponderance of the evidence.

As to whether or not demand was made upon the appellant for a return of the money a reasonable time before the institution of the suit was a question of fact for the chancellor, and his finding to the effect that appellant had reasonable notice is correct. See 10 Cyc., pp. 1077-1078.

(7)    There was error in the matter of interest. It is admitted by the appellant in its answer that the appel-

lee was entitled to the amount which he claimed as salary. The basis for the amount of the judgment was the note for $5,193 executed by the appellant, through its president, on May 30, 1914. This should be taken as an admission of the amount due on the contract up to that date, including the salary.

The court's decree, however, was erroneous in making this entire sum bear interest from May 30, 1914. Only the sum of $5,000, under the terms of the loan agreement, should bear 10 per cent interest from May 30, 1914. The amount included in the judgment as salary, which has not been shown, and which the clerk may ascertain, should only bear interest at the rate of 6 per cent from May 30, 1914. The decree will be modified to this extent, and, with such modification, affirmed.

### DISSENTING OPINION.

McCULLOCH, C. J. It is well that the court has so plainly labeled the contract in this case as one for the lending of money, otherwise it would never be recognized as such. The plain English of it is for the sale of stock of a corporation. It not only provides for the sale of the stock to appellee, but stipulates that he is to be made a director and the secretary and to receive a salary as such. He does not fail in his complaint to sue for his salary as secretary, and it appears that he has actually been drawing a salary, yet his attitude now is one purely of lender of money to the corporation. The contract is very plain in its terms and is one that was dictated by appellee himself and written by his own attorney. I am unable to see how it can be treated as a contract for the loan of money. It does provide that appellee "shall have the right at any time to withdraw the amount invested by him, if he sees fit to do so, upon tendering back the certificates of stock held by him," but that clause, instead of making it a contract for the loan of money, clearly characterizes it as one for the sale of shares of stock, with the guaranty that the dividends should amount to as much as 10 per cent, and that the shares would be repurchased by the corporation if the purchaser so elected. No amount of

testimony with respect to what the parties actually intended can alter the express language of the contract, for it must be judged by what was written down and not by what the parties thought they were writing. The rule that contemporary or antecedent negotiations are merged into the writing is so elemental that it is unnecessary to cite authorities. Parol evidence of such negotiations is inadmissible to contradict the express terms of the contract.

Treating the contract as one for the sale and repurchase of the stock at a guaranteed price, it was clearly *ultra vires* and void. If the corporation could make a valid contract of that kind with appellee, it could make the same with every other stockholder, and in that way could denude itself of all of its assets, leaving innocent stockholders and creditors without anything but the empty shell. The case of *Boley* v. *Sonora Development Co.*, 126 Mo. App. 116, 103 S. W. 975, is precisely in point, and it was there held that "a corporation has no power to sell stock and agree with the purchaser to buy it back within a given time at the price paid, upon his election to sell, thus releasing him from his responsibility as a stockholder." To the same effect see *Chrisman-Sawyer Banking Co.* v. *Independence Wool Mfg. Co.*, 168 Mo. 634, 68 S. W. 1026, and *Wilson* v. *Torchon Lace & Mercantile Co.* (Mo.), 149 S. W. 1156. The reasons are so clearly stated in those opinions, it is unnecessary to go into the subject further, for the injustice of permitting such conduct is obvious.

Now, if Robinson and Peay, the persons who negotiated this contract with appellee, were the only ones interested in the corporation, the contract might be upheld as their own and they would be estopped, as sole owners of the corporation, to raise the question of *ultra vires*. But such is not the facts of this case. It is true, there is evidence tending to show that they were the only two at the time the contract was made, except Robinson's son, who owned one qualifying share. The evidence shows, however, that at the time this suit was brought there was

another stockholder owning eighty shares of stock, and that there. were creditors, and that both Robinson and Peay had hypothecated their own stock to other persons. Subsequent purchasers of stock and subsequent creditors of the corporation are entitled to protection from the effects of such a contract as this and they are not chargeable with notice of its provisions. The policy of the law is to facilitate the negotiability of corporate stock by treating it as free from all equities and liens except such as are created under statutes. *Bankers Trust Co.* v. *McCloy,* 109 Ark. 160. The same principle would seem to forbid the making of such a contract as this which gives a preference to a stockholder thus favored.

Appellee shows in his complaint that the corporation is insolvent and is tottering toward the doors of the bankruptcy court, and yet the decision in this case permits him, after having speculated upon the contingencies of the investment, to hold the corporation liable at the expense of other stockholders and creditors who doubtless dealt with it on the faith that it is assets would not be spent in retiring any of its stock.

Justice SMITH concurs in the dissent.